**SOUTHWESTERN BELL TELEPHONE COMPANY, (Plaintiff) Appellant,**

v.

Hershel WEBB and Helen Webb, his wife, Fred Melton and Tina Melton, his wife, John Mothershead, Richard M. Secor, Sr., and Martha Secor, his wife, James A. Montgomery, Jr., and Catherine Montgomery, his wife, Jefferson Trust Company, a corporation, trustee, and Gravois Bank, Cestui que trust, (Defendants) Respondents.

No. 31958.

St. Louis Court of Appeals.

Missouri.

June 15, 1965.

Rehearing Denied July 13, 1965.

Application to Transfer Denied Sept. 13, 1965.

Samuel Richeson, Dearing, Richeson, Weier & Roberts, Hillsboro, John Mohler, and Leo E. Eickhoff, Jr., St. Louis, for appellant.

Thurman, Nixon & Smith, J. W. Thurman, Hillsboro, for respondents.

L. F. COTTEY, Special Judge.

Respondents are the owners of a tract of land platted, but not otherwise developed, as a residential subdivision of eighty-eight lots in the rapidly expanding Maxville community in Jefferson County. Appellant has acquired by condemnation an easement over a 1-rod wide strip along the entire southern boundary of the tract for the purpose of constructing an underground communication system "consisting of underground cables, wires, conduits, surface testing terminals, markers and other necessary appurtenances," and for the purpose of entering thereon whenever necessary "to construct, operate, maintain, inspect, replace and remove" the paraphernalia comprising the system, and to keep "the surface and sub-surface of said strip" free from all obstructions that might interfere with its use. Promptly upon acquiring the right-of-way appellant buried on it, to a depth of forty inches, a cable consisting of 600 separately insulated copper wires, of such complexity that two man-days are required to splice it at any given point.

The evidence on the issue of consequential damages was to this effect: At a point about midway on the southern boundary of the subdivision respondents' plans called for the construction of a sewer lagoon having a surface area of 1.42 acres, the minimum required by law for the service of eighty-eight family dwellings. The topography of the land is such that this is the only feasible location for it. Even so, as originally planned, it would have been necessary to excavate as far as practicable into an adjacent hillside, and to use a portion of the bed of a nearby creek, in order to obtain an adequate floor for the basin. The backslope of the lagoon dam would then have rested on the southern boundary line of the property. In addition, since the creek provides the drainage for the area, use of its bed would have required the concurrent excavation of a diversion channel

to take its place. Only in that manner could a lagoon of the required capacity be constructed. The diversion channel must be excavated to a depth below the 40-inch level at which the cable lies buried. That project, as well as the construction of the dam, requires the use of heavy machinery which, from its own weight or from the inattention of the operator, is likely to cause the cable to be damaged, and for that reason it would be imprudent to operate it on the right-of-way strip; as one witness put it, "I wouldn't dare." Accordingly, it has become necessary for respondents to revise their original plans so as to relocate the dam one rod back from the south property line (and apparently enough more to allow for a new method of diverting the surface drainage) thereby narrowing the lagoon and reducing its surface area to 1.16 acres, sufficient only for the service of eighty-three family units. The remaining five lots will, therefore, have to be supplied with septic tanks at a cost of $700–$750 each. This, in addition to the fact that the fronts of nine lots abutting the south property line are traversed by the right-of-way. Estimates of the overall damage to respondents' property resulting from appellant's appropriation and use of the easement ranged from $500 to $20,000. The jury settled on a figure of $3,500.

Appellant complains of the admission of all the evidence relating to those consequential damages. Its objections are premised on the proposition that in its original petition (and in an amendment which the court allowed on the eve of trial) it had entirely extinguished the necessity for any revision of respondents' plans for developing their subdivision, and virtually every other prospect of damage to it, by inserting a number of "reservations" to respondents, the effect of which the trial court misunderstood, the benefit of which respondents rejected, and the value of which the jury ignored; all to the end that the verdict was unconscionably excessive. The reservations giving rise to these reproaches are as follows:

(a) That respondents might "freely use and enjoy their interests" in the strip condemned—"insofar as the exercise thereof does not endanger or interfere with the construction, operation and maintenance of said communication system, or create a hazard thereto";

(b) That respondents might "cultivate and grow crops" on the condemned strip;

(c) That respondents might erect buildings thereon—"with the written consent of plaintiff"; and,

(d) That respondents might use the easement area "for the backslope of the lagoon dam * * * and * * * for a drainage channel for surface waters." This latter concession is accompanied by the promise that "the Telephone Company shall bear any expense of adjusting or lowering its communication system so as to permit the construction of the drainage channel."

We pause to notice, and to emphasize, the fact that in this case the pleading of the reservations was allowed; respondents' motion to strike them for indefiniteness was overruled. Moreover, appellant was permitted to hypothesize a most optimistic appraisal of their extent and utility in the examination and cross-examination of every witness who testified on the issue of consequential damages. The same interpretation of their scope and nature was submitted to the jury by appellant's Instruction P-2 which listed the reservations and told the jury to bear them in mind in assessing the damages to be awarded. In all those respects appellant could not have been more generously treated. On the face of the record, therefore, it seems hardly appropriate for appellant to argue that all of its "claims of error turn upon the proposition as to whether or not plaintiff *had the right* * * * to restrict defendants' damages" by setting up the reservations. That right was freely accorded and fully exercised.

What appellant is actually contending for is: That the pleaded reservations were so definite in terms and so generous in scope as to eliminate the neces-

sity for any change in respondents' plans for construction of the sewer lagoon and diversion channel, and hence to preclude the allowance of any damages claimed on that score and, indeed, to foreclose all inquiry into that subject, *as a matter of law.* We cannot agree. In the first place, appellant did not ask to have the issue of consequential damages (or the objectionable aspects thereof) withdrawn from the jury's consideration in the trial court; on the contrary, by Instruction P-2 it submitted the reservations to the jury in terms, admonished the jury to bear them in mind on the question of damages generally, and thereby invited the jury to treat as an issue of fact the very proposition that is now urged upon us as a question of law. Appellant must be held on this appeal to the theory on which it submitted the case in the court below. Johnson v. Duensing, Mo., 332 S.W.2d 950, 957. In the second place, although it is a question of law as to whether the pleaded reservations constitute a limitation of the taking *to some degree,* and hence reduce *to some degree* the damages to which the condemnee is entitled, nevertheless, if after the pleading of them there remains a reasonable doubt as to their extent and effect, that question must be submitted to the jury as a *question of fact* because it is fundamental to, and inseparable from, the issue both as to the value of the rights taken and the value of the rights retained, which the jury is obliged to resolve in order to arrive at an assessment of *net* damages. As said in St. Louis, K. & N. W. Ry. Co. v. Clark, 121 Mo. 169, 25 S.W. 192, 198, 26 L.R.A. 751, "Whether that (reserved) right diminished the damages to the adjoining land should have been left to the jury." In other words, if the condemnor appropriates "less than the full rights available under the law * * * that fact is a proper element to consider on the issue of damages," Union Electric Co. v. Levin, Mo.App., 304 S.W. 2d 478, 483; it invites inquiry by the jury, it does not foreclose it. Finally, appellant's proposition accords to the reservations in this case a more positive and bene-

ficial effect than an impersonal analysis of their wording seems able to support:

■ Item: The decree authorized appellant to bury not only the existing cable but such others as the future expansion of the system might require, and to "maintain, inspect, replace and remove" them as occasion may demand; to erect on the land all "surface testing terminals" and "other necessary appurtenances" (whatever that may include) that the operation of the system might ever require; and, in short, to do anything on and under the surface of the land that could contribute to the efficiency of the system or protect it from harm. "It is presumed that the appropriator will exercise his rights to the full extent." Union Electric Co. v. Levin, supra, 481. Now to what extent are such comprehensive rights abridged by a reservation that permits the land to be used *in such a manner as not to interfere with them?*

Item: Circumscribed by that paradoxical limitation, the right is reserved to respondents to build their lagoon dam and diversion channel on the easement strip. But only at their peril. Observe that if the system is disrupted either by the initial excavations or by subsequent seepage from the lagoon or erosion by the drainage, respondents are no wise relieved of the burden of compensating appellant for the damage. Observe that if it should hereafter become expedient for appellant to dig up the dam in order to repair the cable or install "other necessary appurtenances," no provision is made for the plight of the eighty-eight families who will be without a sewer during the interval required for completion of the project and the restoration of the dam to a functional state; nor is any notice taken of the likelihood that prospective purchasers of the lots, informed of the risk of being deprived of sewage disposal facilities at intervals in the future, might discover a certain cooling of ardor to acquire such an inconvenience. Much is made of appellant's promise to "bear any expense of adjusting or lowering its communication system." By whom

is that work to be done? If by appellant, then with what litigious quibbles and delays in its execution? If by respondents, then with what litigious quibbles and delays in its reimbursement? Would anyone regard dependency on such a promise as a full recompense for the rights which respondents enjoyed before the strip was condemned?

Item: Consider, objectively, the value of the right to "cultivate and grow crops" on the condemned strip. Might not a prospective purchaser, possessed of those faculties that reasonable men are supposed to exercise however feebly and languidly, ask himself whether the appearance of his property would be enhanced, or his investment brought to yield a more attractive return, by planting a 16½ foot row of crops in front of his house?

Item: Consider, objectively, the substance of a reservation by which respondents are permitted to approach appellant for "written consent" to erect a building on the condemned strip. To put the shoe on the other foot, would appellant be content with a decree that authorized it to construct its communication system on the condemned strip *subject to respondents' right to give or withhold permission for it?*

■ It is not the function of the court in a condemnation suit to work out a contract between the parties as to what each may or will do in the future, but only to assess the damages for what has already been done. The purpose of the action is to determine existing rights, not to promote future litigation. The language of the reservations in this case could hardly be more equivocal in terms, more illusory in meaning, or more impalpable in effect. And on this head it may be remarked that ambiguity has so often been the herald of delusion that appellant, having selected such an ambassador, ought not be heard to complain if the jury examined his credentials. We hold, therefore, that the pleadings did not preclude inquiry into the matters com-

plained of; that the evidence to which objection was made was competent on the issue of respondents' consequential damages, City of St. Louis v. Paramount Shoe Mfg. Co., 237 Mo.App. 200, 168 S.W.2d 149, 153; that it was properly argued to the jury; and that the verdict based on it was not excessive. Nor do we find reversible error in the answers of Witnesses Houska and Mothershead or in the admission of evidence of the sale price of the Wurtz tract, which assignments we have considered but deem it unnecessary to discuss in detail.

■■ Appellant's final complaint is predicated on the assertion that "not one single iota of defendant's land was actually taken." From that base it is projected that the court erred in instructing the jury, at respondents' request, that in computing the net damages it "should ascertain the amount and reasonable value of the land actually taken and the damages, or decrease, if any, in the value of the remainder of defendant's property as a whole," etc. If no land has been taken, where is the cable? Where will its fellows be when the time comes to lay them? Where are the "surface terminals, markers, and other necessary appurtenances?" Is it to be supposed that to constitute an "actual taking" some portion of the soil must be removed from the owner's premises? We think that to the extent the land is invaded and the owner's proprietary rights in it are taken, the land is taken. 29A C.J.S. Eminent Domain § 110, p. 442, et seq. The instruction properly hypothesized the issue; it did not authorize an award of double damages; it did not conflict with Instruction P-2; it has been uniformly approved. Union Electric Company of Missouri v. Miller, Mo.App., 354 S.W.2d 341, and cases cited.

Finding no materially prejudicial error in appellant's lengthy catalogue of assignments, the judgment is affirmed.

WOLFE, P. J., and ANDERSON, J., concur.