# LORETTO *v.* TELEPROMPTER MANHATTAN CATV CORP. ET AL.

No. 81–244.   Argued March 30, 1982—Decided June 30, 1982

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and WHITE, JJ., joined, *post*, p. 442.

*Michael S. Gruen* argued the cause and filed briefs for appellant.

*Erwin N. Griswold* argued the cause for appellees. With him on the brief for appellees Teleprompter Manhattan

CATV Corp. et al. was *Michael Lesch*. *Frederick A. O. Schwarz, Jr.*, and *Leonard Koerner* filed a brief for appellee City of New York.*

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether a minor but permanent physical occupation of an owner's property authorized by government constitutes a "taking" of property for which just compensation is due under the Fifth and Fourteenth Amendments of the Constitution. New York law provides that a landlord must permit a cable television company to install its cable facilities upon his property. N. Y. Exec. Law § 828(1) (McKinney Supp. 1981–1982). In this case, the cable installation occupied portions of appellant's roof and the side of her building. The New York Court of Appeals ruled that this appropriation does not amount to a taking. 53 N. Y. 2d 124, 423 N. E. 2d 320 (1981). Because we conclude that such a physical occupation of property is a taking, we reverse.

I

Appellant Jean Loretto purchased a five-story apartment building located at 303 West 105th Street, New York City, in 1971. The previous owner had granted appellees Teleprompter Corp. and Teleprompter Manhattan CATV (collectively Teleprompter)[1] permission to install a cable on the building and the exclusive privilege of furnishing cable

---

*Michael D. Botwin* and *James J. Bierbower* filed a brief for the National Satellite Cable Association et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Robert Abrams*, Attorney General, *pro se*, *Shirley Adelson Siegel*, Solicitor General, and *Lawrence J. Logan*, Assistant Attorney General, for the Attorney General of New York; by *Brenda L. Fox, James H. Ewalt*, and *Robert St. John Roper* for the National Cable Television Association, Inc.; and by *Stuart Robinowitz* and *Richard A. Rosen* for the New York State Cable Television Association.

[1] Teleprompter Manhattan CATV was formerly a subsidiary, and is now a division, of Teleprompter Corp.

television (CATV) services to the tenants. The New York Court of Appeals described the installation as follows:

> "On June 1, 1970 TelePrompter installed a cable slightly less than one-half inch in diameter and of approximately 30 feet in length along the length of the building about 18 inches above the roof top, and directional taps, approximately 4 inches by 4 inches by 4 inches, on the front and rear of the roof. By June 8, 1970 the cable had been extended another 4 to 6 feet and cable had been run from the directional taps to the adjoining building at 305 West 105th Street." *Id.*, at 135, 423 N. E. 2d, at 324.

Teleprompter also installed two large silver boxes along the roof cables. The cables are attached by screws or nails penetrating the masonry at approximately two-foot intervals, and other equipment is installed by bolts.

Initially, Teleprompter's roof cables did not service appellant's building. They were part of what could be described as a cable "highway" circumnavigating the city block, with service cables periodically dropped over the front or back of a building in which a tenant desired service. Crucial to such a network is the use of so-called "crossovers"—cable lines extending from one building to another in order to reach a new group of tenants.[2] Two years after appellant purchased the building, Teleprompter connected a "noncrossover" line— *i. e.*, one that provided CATV service to appellant's own tenants—by dropping a line to the first floor down the front of appellant's building.

---

[2] The Court of Appeals defined a "crossover" more comprehensively as occurring:

"[W]hen (1) the line servicing the tenants in a particular building is extended to adjacent or adjoining buildings, (2) an amplifier which is placed on a building is used to amplify signals to tenants in that building and in a neighboring building or buildings, and (3) a line is placed on a building, none of the tenants of which are provided CATV service, for the purpose of providing service to an adjoining or adjacent building." 53 N. Y. 2d, at 133, n. 6, 423 N. E. 2d, at 323, n. 6.

Prior to 1973, Teleprompter routinely obtained authorization for its installations from property owners along the cable's route, compensating the owners at the standard rate of 5% of the gross revenues that Teleprompter realized from the particular property. To facilitate tenant access to CATV, the State of New York enacted § 828 of the Executive Law, effective January 1, 1973. Section 828 provides that a landlord may not "interfere with the installation of cable television facilities upon his property or premises," and may not demand payment from any tenant for permitting CATV, or demand payment from any CATV company "in excess of any amount which the [State Commission on Cable Television] shall, by regulation, determine to be reasonable."[3] The landlord may, however, require the CATV company or the tenant to bear the cost of installation and to indemnify for any damage caused by the installation. Pursuant to § 828(1)(b), the State Commission has ruled that a one-time $1 payment

---

[3] New York Exec. Law § 828 (McKinney Supp. 1981–1982) provides in part:

"1. No landlord shall

"a. interfere with the installation of cable television facilities upon his property or premises, except that a landlord may require:

"i. that the installation of cable television facilities conform to such reasonable conditions as are necessary to protect the safety, functioning and appearance of the premises, and the convenience and well-being of other tenants;

"ii. that the cable television company or the tenant or a combination thereof bear the entire cost of the installation, operation or removal of such facilities; and

"iii. that the cable television company agree to indemnify the landlord for any damage caused by the installation, operation or removal of such facilities.

"b. demand or accept payment from any tenant, in any form, in exchange for permitting cable television service on or within his property or premises, or from any cable television company in exchange therefor in excess of any amount which the commission shall, by regulation, determine to be reasonable; or

"c. discriminate in rental charges, or otherwise, between tenants who receive cable television service and those who do not."

is the normal fee to which a landlord is entitled. *In the Matter of Implementation of Section 828 of the Executive Law*, No. 90004, Statement of General Policy (New York State Commission on Cable Television, Jan. 15, 1976) (Statement of General Policy), App. 51–52; Clarification of General Policy (Aug. 27, 1976), App. 68–69. The Commission ruled that this nominal fee, which the Commission concluded was equivalent to what the landlord would receive if the property were condemned pursuant to New York's Transportation Corporations Law, satisfied constitutional requirements "in the absence of a special showing of greater damages attributable to the taking." Statement of General Policy, App. 52.

Appellant did not discover the existence of the cable until after she had purchased the building. She brought a class action against Teleprompter in 1976 on behalf of all owners of real property in the State on which Teleprompter has placed CATV components, alleging that Teleprompter's installation was a trespass and, insofar as it relied on § 828, a taking without just compensation. She requested damages and injunctive relief.[4] Appellee City of New York, which has granted Teleprompter an exclusive franchise to provide CATV within certain areas of Manhattan, intervened. The Supreme Court, Special Term, granted summary judgment to Teleprompter and the city, upholding the constitutionality of § 828 in both crossover and noncrossover situations. 98 Misc. 2d 944, 415 N. Y. S. 2d 180 (1979). The Appellate Division affirmed without opinion. 73 App. Div. 2d 849, 422 N. Y. S. 2d 550 (1979).

On appeal, the Court of Appeals, over dissent, upheld the statute. 53 N. Y. 2d 124, 423 N. E. 2d 320 (1981). The court concluded that the law requires the landlord to allow both crossover and noncrossover installations but permits him to

---

[4] Class-action status was granted in accordance with appellant's request, except that owners of single-family dwellings on which a CATV component had been placed were excluded. Notice to the class has been postponed, however, by stipulation.

request payment from the CATV company under § 828(1)(b), at a level determined by the State Cable Commission, only for noncrossovers. The court then ruled that the law serves a legitimate police power purpose—eliminating landlord fees and conditions that inhibit the development of CATV, which has important educational and community benefits. Rejecting the argument that a physical occupation authorized by government is necessarily a taking, the court stated that the regulation does not have an excessive economic impact upon appellant when measured against her aggregate property rights, and that it does not interfere with any reasonable investment-backed expectations. Accordingly, the court held that § 828 does not work a taking of appellant's property. Chief Judge Cooke dissented, reasoning that the physical appropriation of a portion of appellant's property is a taking without regard to the balancing analysis courts ordinarily employ in evaluating whether a regulation is a taking.

In light of its holding, the Court of Appeals had no occasion to determine whether the $1 fee ordinarily awarded for a noncrossover installation was adequate compensation for the taking. Judge Gabrielli, concurring, agreed with the dissent that the law works a taking but concluded that the $1 presumptive award, together with the procedures permitting a landlord to demonstrate a greater entitlement, affords just compensation. We noted probable jurisdiction. 454 U. S. 938 (1981).

## II

The Court of Appeals determined that § 828 serves the legitimate public purpose of "rapid development of and maximum penetration by a means of communication which has important educational and community aspects," 53 N. Y. 2d, at 143–144, 423 N. E. 2d, at 329, and thus is within the State's police power. We have no reason to question that determination. It is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid. See *Penn Central Transporta-*

*tion Co.* v. *New York City,* 438 U. S. 104, 127–128 (1978); *Delaware, L. & W. R. Co.* v. *Morristown,* 276 U. S. 182, 193 (1928). We conclude that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve. Our constitutional history confirms the rule, recent cases do not question it, and the purposes of the Takings Clause compel its retention.

### A

In *Penn Central Transportation Co.* v. *New York City, supra,* the Court surveyed some of the general principles governing the Takings Clause. The Court noted that no "set formula" existed to determine, in all cases, whether compensation is constitutionally due for a government restriction of property. Ordinarily, the Court must engage in "essentially ad hoc, factual inquiries." *Id.,* at 124. But the inquiry is not standardless. The economic impact of the regulation, especially the degree of interference with investment-backed expectations, is of particular significance. "So, too, is the character of the governmental action. A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Ibid.* (citation omitted).

As *Penn Central* affirms, the Court has often upheld substantial regulation of an owner's use of his own property where deemed necessary to promote the public interest. At the same time, we have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such a case, "the character of the government action" not only is an important factor in resolving whether the action works a taking but also is determinative.

When faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking.[5]   As early as 1872, in *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, this Court held that the defendant's construction, pursuant to state authority, of a dam which permanently flooded plaintiff's property constituted a taking. A unanimous Court stated, without qualification, that "where real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution." *Id.*, at 181.   Seven years later, the Court reemphasized the importance of a physical occupation by distinguishing a regulation that merely restricted the use of private property.   In *Northern Transportation Co.* v. *Chicago*, 99 U. S. 635 (1879), the Court held that the city's construc-

---

[5] Professor Michelman has accurately summarized the case law concerning the role of the concept of physical invasions in the development of takings jurisprudence:

"At one time it was commonly held that, in the absence of explicit expropriation, a compensable 'taking' could occur *only* through physical encroachment and occupation.   The modern significance of physical occupation is that courts, while they sometimes do hold nontrespassory injuries compensable, *never* deny compensation for a physical takeover.   The one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, 'regularly' use, or 'permanently' occupy, space or a thing which theretofore was understood to be under private ownership." Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1184 (1967) (emphasis in original; footnotes omitted).

See also 2 J. Sackman, Nichols' Law of Eminent Domain 6–50, 6–51 (rev. 3d ed. 1980); L. Tribe, American Constitutional Law 460 (1978).

For historical discussions, see 53 N. Y. 2d, at 157–158, 423 N. E. 2d, at 337–338 (Cooke, C. J., dissenting); F. Bosselman, D. Callies, & J. Banta, The Taking Issue 51 (1973); Stoebuck, A General Theory of Eminent Domain, 47 Wash. L. Rev. 553, 600–601 (1972); Dunham, Griggs v. Allegheny County in Perspective: Thirty Years of Supreme Court Expropriation Law, 1962 S. Ct. Rev. 63, 82; Cormack, Legal Concepts in Cases of Eminent Domain, 41 Yale L. J. 221, 225 (1931).

tion of a temporary dam in a river to permit construction of a tunnel was not a taking, even though the plaintiffs were thereby denied access to their premises, because the obstruction only impaired the use of plaintiffs' property. The Court distinguished earlier cases in which permanent flooding of private property was regarded as a taking, *e. g., Pumpelly, supra,* as involving "a physical invasion of the real estate of the private owner, and a practical ouster of his possession." In this case, by contrast, "[n]o entry was made upon the plaintiffs' lot." 99 U. S., at 642.

Since these early cases, this Court has consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation. See *United States* v. *Lynah,* 188 U. S. 445, 468–470 (1903); *Bedford* v. *United States,* 192 U. S. 217, 225 (1904); *United States* v. *Cress,* 243 U. S. 316, 327–328 (1917); *Sanguinetti* v. *United States,* 264 U. S. 146, 149 (1924) (to be a taking, flooding must "constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property"); *United States* v. *Kansas City Life Ins. Co.,* 339 U. S. 799, 809–810 (1950).

In *St. Louis* v. *Western Union Telegraph Co.,* 148 U. S. 92 (1893), the Court applied the principles enunciated in *Pumpelly* to a situation closely analogous to the one presented today. In that case, the Court held that the city of St. Louis could exact reasonable compensation for a telegraph company's placement of telegraph poles on the city's public streets. The Court reasoned:

> "The use which the [company] makes of the streets is an exclusive and permanent one, and not one temporary, shifting and in common with the general public. The ordinary traveler, whether on foot or in a vehicle, passes to and fro along the streets, and his use and occupation

thereof are temporary and shifting. The space he occupies one moment he abandons the next to be occupied by any other traveller. . . . *But the use made by the telegraph company is, in respect to so much of the space as it occupies with its poles, permanent and exclusive.* It as effectually and permanently dispossesses the general public as if it had destroyed that amount of ground. Whatever benefit the public may receive in the way of transportation of messages, that space is, so far as respects its actual use for purposes of highway and personal travel, wholly lost to the public. . . .

.        .        .        .        .

". . . It matters not for what that exclusive appropriation is taken, whether for steam railroads or street railroads, telegraphs or telephones, the state may if it chooses exact from the party or corporation given such exclusive use pecuniary compensation to the general public for being deprived of the common use of the portion thus appropriated." *Id.*, at 98–99, 101–102 (emphasis added).[6]

Similarly, in *Western Union Telegraph Co.* v. *Pennsylvania R. Co.*, 195 U. S. 540 (1904), a telegraph company constructed and operated telegraph lines over a railroad's right of way. In holding that federal law did not grant the company the right of eminent domain or the right to operate the lines absent the railroad's consent, the Court assumed that

---

[6] The City of New York objects that this case only involved a city's right to charge for use of its streets, and not the power of eminent domain; the city could have excluded the company from any use of its streets. But the physical occupation principle upon which the right to compensation was based has often been cited as authority in eminent domain cases. See, *e. g., Western Union Telegraph Co.* v. *Pennsylvania R. Co.*, 195 U. S. 540, 566–567 (1904); *California* v. *United States*, 395 F. 2d 261, 263, n. 4 (CA9 1968). Also, the Court squarely held that insofar as the company relied on a federal statute authorizing its use of post roads, an appropriation of state property would require compensation. *St. Louis* v. *Western Union Telegraph Co.*, 148 U. S., at 101.

the invasion of the telephone lines would be a compensable taking. *Id.*, at 570 (the right-of-way "cannot be appropriated in whole or in part except upon the payment of compensation"). Later cases, relying on the character of a physical occupation, clearly establish that permanent occupations of land by such installations as telegraph and telephone lines, rails, and underground pipes or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land. See, *e. g., Lovett* v. *West Va. Central Gas Co.*, 65 W. Va. 739, 65 S. E. 196 (1909); *Southwestern Bell Telephone Co.* v. *Webb*, 393 S. W. 2d 117, 121 (Mo. App. 1965). Cf. *Portsmouth Harbor Land & Hotel Co.* v. *United States*, 260 U. S. 327 (1922). See generally 2 J. Sackman, Nichols' Law of Eminent Domain § 6.21 (rev. 3d ed. 1980).[7]

More recent cases confirm the distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property. In *United States* v. *Causby*, 328 U. S. 256 (1946), the Court ruled that frequent flights immediately above a landowner's property constituted a taking, comparing such overflights to the quintessential form of a taking:

> "If, by reason of the frequency and altitude of the flights, respondents could not use this land for any purpose, their loss would be complete. It would be as complete as if the United States had entered upon the surface of the land and taken exclusive possession of it." *Id.*, at 261 (footnote omitted).

---

[7] Early commentators viewed a physical occupation of real property as the quintessential deprivation of property. See, *e. g.*, 1 W. Blackstone, Commentaries *139; J. Lewis, Law of Eminent Domain in the United States 197 (1888) ("Any invasion of property, except in case of necessity . . . , either upon, above or below the surface, and whether temporary or permanent, is a *taking:* as by constructing a ditch through it, passing under it by a tunnel, laying gas, water or sewer pipes in the soil, or extending structures over it, as a bridge or telephone wire" (footnote omitted; emphasis in original)); 1 P. Nichols, Law of Eminent Domain 282 (2d ed. 1917).

As the Court further explained,

> "We would not doubt that, if the United States erected an elevated railway over respondents' land at the precise altitude where its planes now fly, there would be a partial taking, even though none of the supports of the structure rested on the land. The reason is that there would be an intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it." *Id.*, at 264–265.

The Court concluded that the damages to the respondents "were not merely consequential. They were the product of a direct invasion of respondents' domain." *Id.*, at 265–266. See also *Griggs* v. *Allegheny County*, 369 U. S. 84 (1962).

Two wartime takings cases are also instructive. In *United States* v. *Pewee Coal Co.*, 341 U. S. 114 (1951), the Court unanimously held that the Government's seizure and direction of operation of a coal mine to prevent a national strike of coal miners constituted a taking, though members of the Court differed over which losses suffered during the period of Government control were compensable. The plurality had little difficulty concluding that because there had been an "actual taking of possession and control," the taking was as clear as if the Government held full title and ownership. *Id.*, at 116 (plurality opinion of Black, J., with whom Frankfurter, Douglas, and Jackson, JJ., joined; no other Justice challenged this portion of the opinion). In *United States* v. *Central Eureka Mining Co.*, 357 U. S. 155 (1958), by contrast, the Court found no taking where the Government had issued a wartime order requiring nonessential gold mines to cease operations for the purpose of conserving equipment and manpower for use in mines more essential to the war effort. Over dissenting Justice Harlan's complaint that "as a practical matter the Order led to consequences no different from those that would have followed the temporary acquisition of physical possession of these mines by the United States," *id.*, at 181, the Court reasoned that "the Government did not oc-

cupy, use, or in any manner take physical possession of the gold mines or of the equipment connected with them." *Id.,* at 165–166. The Court concluded that the temporary though severe restriction on *use* of the mines was justified by the exigency of war.[8] Cf. *YMCA* v. *United States,* 395 U. S. 85, 92 (1969) ("Ordinarily, of course, government occupation of private property deprives the private owner of his use of the property, and it is this deprivation for which the Constitution requires compensation").

Although this Court's most recent cases have not addressed the precise issue before us, they have emphasized that physical *invasion* cases are special and have not repudiated the rule that any permanent physical *occupation* is a taking. The cases state or imply that a physical invasion is subject to a balancing process, but they do not suggest that a permanent physical occupation would ever be exempt from the Takings Clause.

*Penn Central Transportation Co.* v. *New York City,* as noted above, contains one of the most complete discussions of the Takings Clause. The Court explained that resolving whether public action works a taking is ordinarily an ad hoc inquiry in which several factors are particularly significant— the economic impact of the regulation, the extent to which it interferes with investment-backed expectations, and the character of the governmental action. 438 U. S., at 124. The opinion does not repudiate the rule that a permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine.[9]

---

[8] Indeed, although dissenting Justice Harlan would have treated the restriction as if it were a physical occupation, it is significant that he relied on physical appropriation as the paradigm of a taking. See *United States* v. *Central Eureka Mining Co.,* 357 U. S., at 181, 183–184.

[9] The City of New York and the opinion of the Court of Appeals place great emphasis on *Penn Central*'s reference to a physical invasion "by government," 438 U. S., at 124, and argue that a similar invasion by a private

In *Kaiser Aetna* v. *United States*, 444 U. S. 164 (1979), the Court held that the Government's imposition of a navigational servitude requiring public access to a pond was a taking where the landowner had reasonably relied on Government consent in connecting the pond to navigable water. The Court emphasized that the servitude took the landowner's right to exclude, "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Id.*, at 176. The Court explained:

> "This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioner's private property; rather, the imposition of the navigational servitude in this context will result in an *actual physical invasion* of the privately owned marina. . . . And even if the Government physically invades only an easement in property, it must nonetheless pay compensation. See *United States* v. *Causby*, 328 U. S. 256, 265 (1946); *Portsmouth Co.* v. *United States*, 260 U. S. 327 (1922)." *Id.*, at 180 (emphasis added).

Although the easement of passage, not being a permanent occupation of land, was not considered a taking *per se*, *Kaiser Aetna* reemphasizes that a physical invasion is a government intrusion of an unusually serious character.[10]

---

party should be treated differently. We disagree. A permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a party authorized by the State, is the occupant. See, *e. g.*, *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166 (1872). *Penn Central* simply holds that in cases of physical invasion short of permanent appropriation, the fact that the government itself commits an invasion from which it directly benefits is one relevant factor in determining whether a taking has occurred. 438 U. S., at 124, 128.

[10] See also *Andrus* v. *Allard*, 444 U. S. 51 (1979). That case held that the prohibition of the sale of eagle feathers was not a taking as applied to traders of bird artifacts. "The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. . . . In this case, it is crucial that appellees retain the rights

Another recent case underscores the constitutional distinction between a permanent occupation and a temporary physical invasion. In *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980), the Court upheld a state constitutional requirement that shopping center owners permit individuals to exercise free speech and petition rights on their property, to which they had already invited the general public. The Court emphasized that the State Constitution does not prevent the owner from restricting expressive activities by imposing reasonable time, place, and manner restrictions to minimize interference with the owner's commercial functions. Since the invasion was temporary and limited in nature, and since the owner had not exhibited an interest in excluding all persons from his property, "the fact that [the solicitors] may have 'physically invaded' [the owners'] property cannot be viewed as determinative." *Id.*, at 84.[11]

In short, when the "character of the governmental action," *Penn Central*, 438 U. S., at 124, is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to

---

to possess and transport their property, and to donate or devise the protected birds. . . . [L]oss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim." *Id.*, at 65–66.

[11] Teleprompter's reliance on labor cases requiring companies to permit access to union organizers, see, *e. g.*, *Hudgens* v. *NLRB*, 424 U. S. 507 (1976); *Central Hardware Co.* v. *NLRB*, 407 U. S. 539 (1972); *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105 (1956), is similarly misplaced. As we recently explained:

"[T]he allowed intrusion on property rights is limited to that necessary to facilitate the exercise of employees' § 7 rights [to organize under the National Labor Relations Act]. After the requisite need for access to the employer's property has been shown, the access is limited to (i) union organizers; (ii) prescribed non-working areas of the employer's premises; and (iii) the duration of the organization activity. In short, the principle of accommodation announced in *Babcock* is limited to labor organization campaigns, and the 'yielding' of property rights it may require is both temporary and limited." *Central Hardware Co.*, *supra*, at 545.

whether the action achieves an important public benefit or has only minimal economic impact on the owner.

## B

The historical rule that a permanent physical occupation of another's property is a taking has more than tradition to commend it. Such an appropriation is perhaps the most serious form of invasion of an owner's property interests. To borrow a metaphor, cf. *Andrus* v. *Allard,* 444 U. S. 51, 65–66 (1979), the government does not simply take a single "strand" from the "bundle" of property rights: it chops through the bundle, taking a slice of every strand.

Property rights in a physical thing have been described as the rights "to possess, use and dispose of it." *United States* v. *General Motors Corp.,* 323 U. S. 373, 378 (1945). To the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights. First, the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space. The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights.[12] See *Kaiser Aetna,*

---

[12] The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical *invasion* is a taking. As *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74 (1980), *Kaiser Aetna* v. *United States,* 444 U. S. 164 (1979), and the intermittent flooding cases reveal, such temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property.

The dissent objects that the distinction between a permanent physical occupation and a temporary invasion will not always be clear. *Post,* at 448. This objection is overstated, and in any event is irrelevant to the critical point that a permanent physical occupation *is* unquestionably a taking. In the antitrust area, similarly, this Court has not declined to apply a *per se* rule simply because a court must, at the boundary of the rule, apply the rule of reason and engage in a more complex balancing analysis.

444 U. S., at 179–180; see also Restatement of Property § 7 (1936). Second, the permanent physical occupation of property forever denies the owner any power to control the use of the property; he not only cannot exclude others, but can make no nonpossessory use of the property. Although deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking, see *Andrus* v. *Allard, supra,* at 66, it is clearly relevant. Finally, even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property.

Moreover, an owner suffers a special kind of injury when a *stranger* directly invades and occupies the owner's property. As Part II–A, *supra,* indicates, property law has long protected an owner's expectation that he will be relatively undisturbed at least in the possession of his property. To require, as well, that the owner permit another to exercise complete dominion literally adds insult to injury. See Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1228, and n. 110 (1967). Furthermore, such an occupation is qualitatively more severe than a regulation of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion. See n. 19, *infra.*

The traditional rule also avoids otherwise difficult line-drawing problems. Few would disagree that if the State required landlords to permit third parties to install swimming pools on the landlords' rooftops for the convenience of the tenants, the requirement would be a taking. If the cable installation here occupied as much space, again, few would disagree that the occupation would be a taking. But constitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occu-

pied.[13]    Indeed, it is possible that in the future, additional cable installations that more significantly restrict a landlord's use of the roof of his building will be made.    Section 828 requires a landlord to permit such multiple installations.[14]

Finally, whether a permanent physical occupation has occurred presents relatively few problems of proof.    The placement of a fixed structure on land or real property is an obvious fact that will rarely be subject to dispute.    Once the fact of occupation is shown, of course, a court should consider the *extent* of the occupation as one relevant factor in determining the compensation due.[15]    For that reason, moreover, there is

[13] In *United States* v. *Causby*, 328 U. S. 256 (1946), the Court approvingly cited *Butler* v. *Frontier Telephone Co.*, 186 N. Y. 486, 79 N. E. 716 (1906), holding that ejectment would lie where a telephone wire was strung across the plaintiff's property without touching the soil.    The Court quoted the following language:

"'[A]n owner is entitled to the absolute and undisturbed possession of every part of his premises, including the space above, as much as a mine beneath.    If the wire had been a huge cable, several inches thick and but a foot above the ground, there would have been a difference in degree, but not in principle.    Expand the wire into a beam supported by posts standing upon abutting lots without touching the surface of plaintiff's land, and the difference would still be one of degree only.    Enlarge the beam into a bridge, and yet space only would be occupied.    Erect a house upon the bridge, and the air above the surface of the land would alone be disturbed.'"    328 U. S., at 265, n. 10, quoting *Butler* v. *Frontier Telephone Co.*, *supra*, at 491–492, 79 N. E. 718.

[14] Although the City of New York has granted an exclusive franchise to Teleprompter, it is not required to do so under state law, see N. Y. Exec. Law § 811 *et seq.* (McKinney Supp. 1981–1982), and future changes in technology may cause the city to reconsider its decision.    Indeed, at present some communities apparently grant nonexclusive franchises.    Brief for National Satellite Cable Association et al. as *Amici Curiae* 21.

[15] In this case, the Court of Appeals noted testimony preceding the enactment of § 828 that the landlord's interest in excluding cable installation "consists entirely of insisting that some negligible unoccupied space remain unoccupied." 53 N. Y. 2d, at 141, 423 N. E. 2d, at 328 (emphasis omitted).    The State Cable Commission referred to the same testimony in establishing a $1 presumptive award.    Statement of General Policy, App. 48.

A number of the dissent's arguments—that § 828 "likely increases both the building's resale value and its attractiveness on the rental market,"

less need to consider the extent of the occupation in determining whether there is a taking in the first instance.

## C

Teleprompter's cable installation on appellant's building constitutes a taking under the traditional test. The installation involved a direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall.[16]

In light of our analysis, we find no constitutional difference between a crossover and a noncrossover installation. The portions of the installation necessary for both crossovers and noncrossovers permanently appropriate appellant's property. Accordingly, each type of installation is a taking.

Appellees raise a series of objections to application of the traditional rule here. Teleprompter notes that the law applies only to buildings used as rental property, and draws the

_post_, at 452, and that appellant might have no alternative use for the cable-occupied space, _post_, at 453-454—may also be relevant to the amount of compensation due. It should be noted, however, that the first argument is speculative and is contradicted by appellant's testimony that she and "the whole block" would be able to sell their buildings for a higher price absent the installation. App. 100.

[16] It is constitutionally irrelevant whether appellant (or her predecessor in title) had previously occupied this space, since a "landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land." _United States_ v. _Causby, supra_, at 264.

The dissent asserts that a taking of about one-eighth of a cubic foot of space is not of constitutional significance. _Post_, at 443. The assertion appears to be factually incorrect, since it ignores the two large silver boxes that appellant identified as part of the installation. App. 90; Loretto Affidavit in Support of Motion for Summary Judgment (Apr. 21, 1978), Appellants' Appendix in No. 8300/76 (N. Y. App.), p. 77. Although the record does not reveal their size, appellant states that they are approximately 18″ x 12″ x 6″, Brief for Appellant 6 n.*, and appellees do not dispute this statement. The displaced volume, then, is in excess of 1½ cubic feet. In any event, these facts are not critical: whether the installation is a taking does not depend on whether the volume of space it occupies is bigger than a breadbox.

conclusion that the law is simply a permissible regulation of the use of real property. We fail to see, however, why a physical occupation of one type of property but not another type is any less a physical occupation. Insofar as Teleprompter means to suggest that this is not a permanent physical invasion, we must differ. So long as the property remains residential and a CATV company wishes to retain the installation, the landlord must permit it.[17]

Teleprompter also asserts the related argument that the State has effectively granted a tenant the property right to have a CATV installation placed on the roof of his building, as an appurtenance to the tenant's leasehold. The short answer is that § 828(1)(a) does not purport to give the *tenant* any enforceable property rights with respect to CATV installation, and the lower courts did not rest their decisions on this ground.[18] Of course, Teleprompter, not appellant's tenants, actually owns the installation. Moreover, the government does not have unlimited power to redefine property rights. See *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155, 164 (1980) ("a State, by *ipse dixit*, may not transform private property into public property without compensation").

---

[17] It is true that the landlord could avoid the requirements of § 828 by ceasing to rent the building to tenants. But a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation. Teleprompter's broad "use-dependency" argument proves too much. For example, it would allow the government to require a landlord to devote a substantial portion of his building to vending and washing machines, with all profits to be retained by the owners of these services and with no compensation for the deprivation of space. It would even allow the government to requisition a certain number of apartments as permanent government offices. The right of a property owner to exclude a stranger's physical occupation of his land cannot be so easily manipulated.

[18] We also decline to hazard an opinion as to the respective rights of the landlord and tenant under state law *prior* to enactment of § 828 to use the space occupied by the cable installation, an issue over which the parties sharply disagree.

Finally, we do not agree with appellees that application of the physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships. This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails. See, *e. g.*, *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241 (1964) (discrimination in places of public accommodation); *Queenside Hills Realty Co.* v. *Saxl*, 328 U. S. 80 (1946) (fire regulation); *Bowles* v. *Willingham*, 321 U. S. 503 (1944) (rent control); *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398 (1934) (mortgage moratorium); *Edgar A. Levy Leasing Co.* v. *Siegel*, 258 U. S. 242 (1922) (emergency housing law); *Block* v. *Hirsh*, 256 U. S. 135 (1921) (rent control). In none of these cases, however, did the government authorize the permanent occupation of the landlord's property by a third party. Consequently, our holding today in no way alters the analysis governing the State's power to require landlords to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like in the common area of a building. So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity. See *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104 (1978).[19]

---

[19] If § 828 required landlords to provide cable installation if a tenant so desires, the statute might present a different question from the question before us, since the landlord would own the installation. Ownership would give the landlord rights to the placement, manner, use, and possibly the disposition of the installation. The fact of ownership is, contrary to the dissent, not simply "incidental," *post*, at 450; it would give a landlord (rather than a CATV company) full authority over the installation except only as government specifically limited that authority. The *landlord* would de-

## III

Our holding today is very narrow. We affirm the traditional rule that a permanent physical occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation, and the character of the invasion is qualitatively more intrusive than perhaps any other category of property regulation. We do not, however, question the equally substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's *use* of his property.

Furthermore, our conclusion that § 828 works a taking of a portion of appellant's property does not presuppose that the fee which many landlords had obtained from Teleprompter prior to the law's enactment is a proper measure of the value of the property taken. The issue of the amount of compensation that is due, on which we express no opinion, is a matter for the state courts to consider on remand.[20]

---

cide how to comply with applicable government regulations concerning CATV and therefore could minimize the physical, esthetic, and other effects of the installation. Moreover, if the landlord wished to repair, demolish, or construct in the area of the building where the installation is located, he need not incur the burden of obtaining the CATV company's cooperation in moving the cable.

In this case, by contrast, appellant suffered injury that might have been obviated if she had owned the cable and could exercise control over its installation. The drilling and stapling that accompanied installation apparently caused physical damage to appellant's building. App. 83, 95–96, 104. Appellant, who resides in her building, further testified that the cable installation is "ugly." *Id.*, at 99. Although § 828 provides that a landlord may require "reasonable" conditions that are "necessary" to protect the appearance of the premises and may seek indemnity for damage, these provisions are somewhat limited. Even if the provisions are effective, the inconvenience to the landlord of initiating the repairs remains a cognizable burden.

[20] In light of our disposition of appellant's takings claim, we do not address her contention that § 828 deprives her of property without due process of law.

The judgment of the New York Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE WHITE join, dissenting.

If the Court's decisions construing the Takings Clause state anything clearly, it is that "[t]here is no set formula to determine where regulation ends and taking begins." *Goldblatt* v. *Town of Hempstead,* 369 U. S. 590, 594 (1962).[1]

In a curiously anachronistic decision, the Court today acknowledges its historical disavowal of set formulae in almost the same breath as it constructs a rigid *per se* takings rule: "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Ante,* at 426. To sustain its rule against our recent precedents, the Court erects a strained and untenable distinction between "temporary physical invasions," whose constitutionality concededly "is subject to a balancing process," and "permanent physical occupations," which are "taking[s] without regard to other factors that a court might ordinarily examine." *Ante,* at 432.

In my view, the Court's approach "reduces the constitutional issue to a formalistic quibble" over whether property has been "permanently occupied" or "temporarily invaded." Sax, Takings and the Police Power, 74 Yale L. J. 36, 37

---

[1] See *Kaiser Aetna* v. *United States,* 444 U. S. 164, 175 (1979); *Andrus* v. *Allard,* 444 U. S. 51, 65 (1979) ("There is no abstract or fixed point at which judicial intervention under the Takings Clause becomes appropriate"); *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 124 (1978); *United States* v. *Caltex, Inc.,* 344 U. S. 149, 156 (1952) ("No rigid rules can be laid down to distinguish compensable losses from noncompensable losses"); *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 416 (1922) (a takings question "is a question of degree—and therefore cannot be disposed of by general propositions").

(1964). The Court's application of its formula to the facts of this case vividly illustrates that its approach is potentially dangerous as well as misguided. Despite its concession that "States have broad power to regulate . . . the landlord-tenant relationship . . . without paying compensation for all economic injuries that such regulation entails," *ante*, at 440, the Court uses its rule to undercut a carefully considered legislative judgment concerning landlord-tenant relationships. I therefore respectfully dissent.

## I

Before examining the Court's new takings rule, it is worth reviewing what was "taken" in this case. At issue are about 36 feet of cable one-half inch in diameter and two 4″ x 4″ x 4″ metal boxes. Jointly, the cable and boxes occupy only about one-eighth of a cubic foot of space on the roof of appellant's Manhattan apartment building. When appellant purchased that building in 1971, the "physical invasion" she now challenges had already occurred.[2] Appellant did not bring this action until about five years later, demanding 5% of appellee Teleprompter's gross revenues from her building, and claiming that the operation of N. Y. Exec. Law § 828 (McKinney

---

[2] In January 1968, appellee Teleprompter signed a 5-year installation agreement with the building's previous owner in exchange for a flat fee of $50. Appellee installed both the 30-foot main cable and its 4- to 6-foot "crossover" extension in June 1970. For two years after taking possession of the building and the appurtenant equipment, appellant did not object to the cable's presence. Indeed, despite numerous inspections, appellant had never even noticed the equipment until Teleprompter first began to provide cable television service to one of her tenants. 53 N. Y. 2d 124, 134–135, 423 N. E. 2d 320, 324 (1981). Nor did appellant thereafter ever specifically ask Teleprompter to remove the components from her building. App. 107, 108, 110.

Although the Court alludes to the presence of "two large silver boxes" on appellant's roof, *ante*, at 438, n. 16, the New York Court of Appeals' opinion nowhere mentions them, nor are their dimensions stated anywhere in the record.

Supp. 1981–1982) "took" her property. The New York Supreme Court, the Appellate Division, and the New York Court of Appeals all rejected that claim, upholding § 828 as a valid exercise of the State's police power.

The Court of Appeals held that

> "the State may proscribe a trespass action by landlords generally against a cable TV company which places a cable and other fixtures on the roof of any landlord's building, in order to protect the right of the tenants of rental property, who will ultimately have to pay any charge a landlord is permitted to collect from the cable TV company, to obtain TV service in their respective apartments."  53 N. Y. 2d 124, 153, 423 N. E. 2d 320, 335 (1981).

In so ruling, the court applied the multifactor balancing test prescribed by this Court's recent Takings Clause decisions. Those decisions teach that takings questions should be resolved through "essentially ad hoc, factual inquiries," *Kaiser Aetna* v. *United States*, 444 U. S. 164, 175 (1979), into "such factors as the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 83 (1980).  See 53 N. Y. 2d, at 144–151, 423 N. E. 2d, at 330–334.

The Court of Appeals found, first, that § 828 represented a reasoned legislative effort to arbitrate between the interests of tenants and landlords and to encourage development of an important educational and communications medium.[3]  *Id.*, at

---

[3] The court found that the state legislature had enacted § 828 to "prohibit gouging and arbitrary action" by "landlords [who] in many instances have imposed extremely onerous fees and conditions on cable access to their buildings."  53 N. Y. 2d, at 141, 423 N. E. 2d, at 328, citing testimony of Joseph C. Swidler, Chairman of the Public Service Commission, before the Joint Legislative Committee considering the CATV bill.

Given the growing importance of cable television, the legislature decided that urban tenants' need for access to that medium justified a minor intrusion upon the landlord's interest, which "consists entirely of insisting that

143–145, 423 N. E. 2d, at 329–330. Moreover, under *PruneYard Shopping Center* v. *Robins,* 447 U. S., at 83–84, the fact that § 828 authorized Teleprompter to make a minor physical intrusion upon appellant's property was in no way determinative of the takings question. 53 N. Y. 2d, at 146–147, 423 N. E. 2d, at 331.[4]

Second, the court concluded that the statute's economic impact on appellant was *de minimis* because § 828 did not affect the fair return on her property. 53 N. Y. 2d, at 148–150, 423 N. E. 2d, at 332–333. Third, the statute did not interfere with appellant's reasonable investment-backed expectations. *Id.,* at 150–151, 423 N. E. 2d, at 333–334. When appellant purchased the building, she was unaware of the existence of the cable. See n. 2, *supra.* Thus, she could not have invested in the building with any reasonable expectation that the one-eighth cubic foot of space occupied by the cable television installment would become income-productive. 53 N. Y. 2d, at 155, 423 N. E. 2d, at 336.

---

some negligible unoccupied space remain unoccupied. The tenant's interest clearly is more substantial, consisting of a right to receive (and perhaps send) communications from and to the outside world. In the electronic age, the landlord should not be able to preclude a tenant from obtaining CATV service (or to exact a surcharge for allowing the service) any more than he could preclude a tenant from receiving mail or telegrams directed to him." *Ibid.,* citing Regulation of Cable Television by the State of New York, Report to the New York Public Service Commission by Commissioner William K. Jones 207 (1970).

[4] Section 828 carefully regulates the cable television company's physical intrusion onto the landlord's property. If the landlord requests, the company must conform its installations "to such reasonable conditions as are necessary to protect the safety, functioning and appearance of the premises, and the convenience and well-being of other tenants." N. Y. Exec. Law § 828(1)(a)(i) (McKinney Supp. 1981–1982). Furthermore, the company must "agree to indemnify the landlord for any damage caused by the installation, operation or removal of such facilities." § 828(1)(a)(iii). Finally, the statute authorizes the landlord to require either "the cable television company or the tenant or a combination thereof [to] bear the entire cost of the installation, operation or removal" of any equipment. § 828(1)(a)(ii).

## II

Given that the New York Court of Appeals' straightforward application of this Court's balancing test yielded a finding of no taking, it becomes clear why the Court now constructs a *per se* rule to reverse. The Court can escape the result dictated by our recent takings cases only by resorting to bygone precedents and arguing that "permanent physical occupations" somehow differ qualitatively from all other forms of government regulation.

The Court argues that a *per se* rule based on "permanent physical occupation" is both historically rooted, see *ante*, at 426–435, and jurisprudentially sound, see *ante*, at 435–438. I disagree in both respects. The 19th-century precedents relied on by the Court lack any vitality outside the agrarian context in which they were decided.[5] But if, by chance, they

---

[5] The Court properly acknowledges that none of our recent takings decisions have adopted a *per se* test for either temporary physical invasions or permanent physical occupations. See *ante*, at 432–435, and 435, n. 12. While the Court relies on historical dicta to support its *per se* rule, the only holdings it cites fall into two categories: a number of cases involving flooding, *ante*, at 427–428, and *St. Louis* v. *Western Union Telegraph Co.*, 148 U. S. 92 (1893), cited *ante*, at 428.

In 1950, the Court noted that the first line of cases stands for "the principle that the destruction of privately owned land by flooding is 'a taking' to the extent of the destruction caused," and that those rulings had already "been limited by later decisions in some respects." *United States* v. *Kansas City Life Ins. Co.*, 339 U. S. 799, 809–810. Even at the time of its decision, *St. Louis* v. *Western Union Telegraph Co.* addressed only the question "[w]hether the city has power to collect rental for the use of streets and public places" when a private company seeks exclusive use of land whose "use is common to all members of the public, and . . . [is] open equally to citizens of other States with those of the State in which the street is situate." 148 U. S., at 98–99. On its face, that issue is distinct from the question here: whether appellant may extract from Teleprompter a fee for the continuing use of her roof space above and beyond the fee set by statute, namely, "any amount which the commission shall, by regulation, determine to be reasonable." N. Y. Exec. Law § 828(1)(b) (McKinney Supp. 1982).

have any lingering vitality, then, in my view, those cases stand for a constitutional rule that is uniquely unsuited to the modern urban age. Furthermore, I find logically untenable the Court's assertion that § 828 must be analyzed under a *per se* rule because it "effectively destroys" three of "the most treasured strands in an owner's bundle of property rights," *ante*, at 435.

## A

The Court's recent Takings Clause decisions teach that *nonphysical* government intrusions on private property, such as zoning ordinances and other land-use restrictions, have become the rule rather than the exception. Modern government regulation exudes intangible "externalities" that may diminish the value of private property far more than minor physical touchings. Nevertheless, as the Court recognizes, it has "often upheld substantial regulation of an owner's use of his own property where deemed necessary to promote the public interest." *Ante*, at 426. See, *e. g.*, *Agins* v. *City of Tiburon*, 447 U. S. 255 (1980); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 124–125 (1978); *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926).

Precisely because the extent to which the government may injure private interests now depends so little on whether or not it has authorized a "physical contact," the Court has avoided *per se* takings rules resting on outmoded distinctions between physical and nonphysical intrusions. As one commentator has observed, a takings rule based on such a distinction is inherently suspect because "its capacity to distinguish, even crudely, between significant and insignificant losses is too puny to be taken seriously." Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1227 (1967).

Surprisingly, the Court draws an even finer distinction today—between "temporary physical invasions" and "perma-

nent physical occupations." When the government author-
izes the latter type of intrusion, the Court would find "a tak-
ing without regard to the public interests" the regulation
may serve. *Ante*, at 426. Yet an examination of each of the
three words in the Court's "permanent physical occupation"
formula illustrates that the newly created distinction is even
less substantial than the distinction between physical and
nonphysical intrusions that the Court already has rejected.

First, what does the Court mean by "permanent"? Since
all "temporary limitations on the right to exclude" remain
"subject to a more complex balancing process to determine
whether they are a taking," *ante*, at 435, n. 12, the Court
presumably describes a government intrusion that lasts for-
ever. But as the Court itself concedes, § 828 does not re-
quire appellant to permit the cable installation forever, but
only "[s]o long as the property remains residential and a
CATV company wishes to retain the installation." *Ante*, at
439. This is far from "permanent."

The Court reaffirms that "States have broad power to reg-
ulate housing conditions in general and the landlord-tenant
relationship in particular without paying compensation for all
economic injuries that such regulation entails." *Ante*, at
440. Thus, § 828 merely defines one of the many statutory
responsibilities that a New Yorker accepts when she enters
the rental business. If appellant occupies her own building,
or converts it into a commercial property, she becomes per-
fectly free to exclude Teleprompter from her one-eighth cubic
foot of roof space. But once appellant chooses to use her
property for rental purposes, she must comply with all rea-
sonable government statutes regulating the landlord-tenant
relationship.[6] If § 828 authorizes a "permanent" occupation,

---

[6] In my view, the fact that § 828 incidentally protects so-called "cross-
over" wires that do not currently serve tenants, see *ante*, at 422, n. 2, does
not affect § 828's fundamental character as a piece of landlord-tenant legis-
lation. As the Court recognizes, *ante*, at 422, crossovers are crucial links
in the cable "highway," and represent the simplest and most economical

and thus works a taking "without regard to the public interests that it may serve," then all other New York statutes that require a landlord to make physical attachments to his rental property also must constitute takings, even if they serve indisputably valid public interests in tenant protection and safety.[7]

The Court denies that its theory invalidates these statutes, because they "do not require the landlord to suffer the physical occupation of a portion of his building by a third party." *Ante*, at 440. But surely this factor cannot be determinative, since the Court simultaneously recognizes that tem-

---

way to provide service to tenants in a group of buildings in close proximity. Like the Court, I find "no constitutional difference between a crossover and a noncrossover installation," *ante*, at 438. Even assuming, *arguendo*, that the crossover extension in this case works a taking, I would be prepared to hold that the incremental governmental intrusion caused by that 4- to 6-foot wire, which occupies the cubic volume of a child's building block, is a *de minimis* deprivation entitled to no compensation.

[7] See, *e. g.*, N. Y. Mult. Dwell. Law § 35 (McKinney 1974) (requiring entrance doors and lights); § 36 (windows and skylights for public halls and stairs); § 50–a (Supp. 1982) (locks and intercommunication systems); § 50–c (lobby attendants); § 51–a (peepholes); § 51–b (elevator mirrors); § 53 (fire escapes); § 57 (bells and mail receptacles); § 67(3) (fire sprinklers). See also *Queenside Hills Realty Co. v. Saxl*, 328 U. S. 80 (1946) (upholding constitutionality of New York fire sprinkler provision).

These statutes specify in far greater detail than § 828 what types of physical facilities a New York landlord must provide his tenants and where he must provide them. See, *e. g.*, N. Y. Mult. Dwell. Law § 75 (McKinney 1974) (owners of multiple dwellings must provide "proper appliances to receive and distribute an adequate supply of water," including "a proper sink with running water and with a two-inch waste and trap"); § 35 (owners of multiple dwellings with frontage exceeding 22 feet must provide "at least two lights, one at each side of the entrance way, with an aggregate illumination of one hundred fifty watts or equivalent illumination"); § 50–a(2) (Supp. 1981–1982) (owners of Class A multiple dwellings must provide intercommunication system "located at an automatic self-locking door giving public access to the main entrance hall or lobby").

Apartment building rooftops are not exempted. See § 62 (landlords must place parapet walls and guardrails on their roofs "three feet six inches or more in height above the level of such area").

porary invasions by third parties are not subject to a *per se* rule. Nor can the qualitative difference arise from the incidental fact that, under § 828, Teleprompter, rather than appellant or her tenants, owns the cable installation. Cf. *ante*, at 440, and n. 19. If anything, § 828 leaves appellant better off than do other housing statutes, since it ensures that her property will not be damaged esthetically or physically, see n. 4, *supra*, without burdening her with the cost of buying or maintaining the cable.

In any event, under the Court's test, the "third party" problem would remain even if appellant herself owned the cable. So long as Teleprompter continuously passed its electronic signal through the cable, a litigant could argue that the second element of the Court's formula—a "physical touching" by a stranger—was satisfied and that § 828 therefore worked a taking.[8] Literally read, the Court's test opens the door to endless metaphysical struggles over whether or not an individual's property has been "physically" touched. It was precisely to avoid "permit[ting] technicalities of form to dictate consequences of substance," *United States* v. *Central Eureka Mining Co.*, 357 U. S. 155, 181 (1958) (Harlan, J., dissenting), that the Court abandoned a "physical contacts" test in the first place.

Third, the Court's talismanic distinction between a continuous "occupation" and a transient "invasion" finds no basis in either economic logic or Takings Clause precedent. In the landlord-tenant context, the Court has upheld against takings challenges rent control statutes permitting "tempo-

---

[8] Indeed, appellant's counsel made precisely this claim at oral argument. Urging the rule which the Court now adopts, appellant's counsel suggested that a taking would result even if appellant owned the cable. "[T]he precise location of the easement [taken by Teleprompter changes] from the surface of the roof to inside the wire. . . . [T]he wire itself is owned by the landlord, but the cable company has the right to pass its signal through the wire without compensation to the landlord, for its commercial benefit." Tr. of Oral Arg. 15.

rary" physical invasions of considerable economic magnitude. See, e. g., *Block* v. *Hirsh,* 256 U. S. 135 (1921) (statute permitting tenants to remain in physical possession of their apartments for two years after the termination of their leases). Moreover, precedents record numerous other "temporary" officially authorized invasions by third parties that have intruded into an owner's enjoyment of property far more deeply than did Teleprompter's long-unnoticed cable. See, e. g., *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74 (1980) (leafletting and demonstrating in busy shopping center); *Kaiser Aetna* v. *United States,* 444 U. S. 164 (1979) (public easement of passage to private pond); *United States* v. *Causby,* 328 U. S. 256 (1946) (noisy airplane flights over private land). While, under the Court's balancing test, some of these "temporary invasions" have been found to be takings, the Court has subjected none of them to the inflexible *per se* rule now adapted to analyze the far less obtrusive "occupation" at issue in the present case. Cf. *ante,* at 430–431, 432–435.

In sum, history teaches that takings claims are properly evaluated under a multifactor balancing test. By directing that all "permanent physical occupations" automatically are compensable, "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner," *ante,* at 434–435, the Court does not further equity so much as it encourages litigants to manipulate their factual allegations to gain the benefit of its *per se* rule. Cf. n. 8, *supra.* I do not relish the prospect of distinguishing the inevitable flow of certiorari petitions attempting to shoehorn insubstantial takings claims into today's "set formula."

## B

Setting aside history, the Court also states that the permanent physical occupation authorized by § 828 is a *per se* taking because it uniquely impairs appellant's powers to dispose of, use, and exclude others from, her property. See *ante,* at

435–438.   In fact, the Court's discussion nowhere demonstrates how § 828 impairs these private rights in a manner *qualitatively* different from other garden-variety landlord-tenant legislation.

The Court first contends that the statute impairs appellant's legal right to dispose of cable-occupied space by transfer and sale.   But that claim dissolves after a moment's reflection.   If someone buys appellant's apartment building, but does not use it for rental purposes, that person can have the cable removed, and use the space as he wishes.   In such a case, appellant's right to dispose of the space is worth just as much as if § 828 did not exist.

Even if another landlord buys appellant's building for rental purposes, § 828 does not render the cable-occupied space valueless.   As a practical matter, the regulation ensures that tenants living in the building will have access to cable television for as long as that building is used for rental purposes, and thereby likely increases both the building's resale value and its attractiveness on the rental market.[9]

In any event, § 828 differs little from the numerous other New York statutory provisions that require landlords to install physical facilities "permanently occupying" common spaces in or on their buildings.   As the Court acknowledges, the States traditionally—and constitutionally—have exercised their police power "to require landlords to . . . provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like in the common area of a building." *Ante*, at 440.   Like § 828, these provisions merely ensure tenants access to services the legislature deems important, such as water, electricity, natural light, telephones, intercommunication systems, and mail service.   See n. 7, *supra.* A landlord's dispositional rights are affected no more ad-

---

[9] In her pretrial deposition, appellant conceded not only that owners of other apartment buildings thought that the cable's presence had enhanced the market value of their buildings, App. 102–103, but also that her own tenants would have been upset if the cable connection had been removed. *Id.*, at 107, 108, 110.

versely when he sells a building to another landlord subject to § 828, than when he sells that building subject only to these other New York statutory provisions.

The Court also suggests that § 828 unconstitutionally alters appellant's right to control the *use* of her one-eighth cubic foot of roof space. But other New York multiple dwelling statutes not only oblige landlords to surrender significantly larger portions of common space for their tenants' use, but also compel the *landlord*—rather than the tenants or the private installers—to pay for and to maintain the equipment. For example, New York landlords are required by law to provide and pay for mailboxes that occupy more than five times the volume that Teleprompter's cable occupies on appellant's building. See Tr. of Oral Arg. 42–43, citing N. Y. Mult. Dwell. Law § 57 (McKinney 1974). If the State constitutionally can insist that appellant make this sacrifice so that her tenants may receive mail, it is hard to understand why the State may not require her to surrender less space, *filled at another's expense*, so that those same tenants can receive television signals.

For constitutional purposes, the relevant question cannot be solely *whether* the State has interfered in some minimal way with an owner's use of space on her building. Any intelligible takings inquiry must also ask whether the *extent* of the State's interference is so severe as to constitute a compensable taking in light of the owner's alternative uses for the property.[10] Appellant freely admitted that she would have

---

[10] For this reason, the Court provides no support for its *per se* rule by asserting that the State could not require landlords, without compensation, "to permit third parties to install swimming pools," *ante*, at 436, or vending and washing machines, *ante*, at 439, n. 17, for the convenience of tenants. Presumably, these more intrusive government regulations would create difficult takings problems even under our traditional balancing approach. Depending on the character of the governmental action, its economic impact, and the degree to which it interfered with an owner's reasonable investment-backed expectations, among other things, the Court's hypothetical examples might or might not constitute takings. These examples

454

had no other use for the cable-occupied space, were Tele-
prompter's equipment not on her building.  See App. 97 (Dep-
osition of Jean A. Loretto).

The Court's third and final argument is that § 828 has de-
prived appellant of her "power to exclude the occupier from
possession and use of the space" occupied by the cable.
*Ante,* at 435.  This argument has two flaws.  First, it unjus-
tifiably assumes that appellant's tenants have no countervail-
ing property interest in permitting Teleprompter to use that
space.[11]  Second, it suggests that the New York Legislature
may not exercise its police power to affect appellant's com-
mon-law right to exclude Teleprompter even from one-eighth
cubic foot of roof space.  But this Court long ago recognized
that new social circumstances can justify legislative modifica-
tion of a property owner's common-law rights, without com-
pensation, if the legislative action serves sufficiently impor-
tant public interests.  See *Munn* v. *Illinois,* 94 U. S. 113,
134 (1877) ("A person has no property, no vested interest, in
any rule of the common law. . . . Indeed, the great office of
statutes is to remedy defects in the common law as they are
developed, and to adapt it to the changes of time and circum-
stance"); *United States* v. *Causby,* 328 U. S., at 260–261 (In
the modern world, "[c]ommon sense revolts at the idea" that
legislatures cannot alter common-law ownership rights).

---

hardly prove, however, that a permanent physical occupation that works a
*de minimis* interference with a private property interest is a taking *per se.*

[11] It is far from clear that, under New York law, appellant's tenants
would lack all property interests in the few square inches on the exterior of
the building to which Teleprompter's cable and hardware attach.  Under
modern landlord-tenant law, a residential tenancy is not merely a posses-
sory interest in specified space, but also a contract for the provision of a
package of services and facilities necessary and appurtenant to that space.
See R. Schoshinski, American Law of Landlord and Tenant § 3:14 (1980).
A modern urban tenant's leasehold often includes not only contractual, but
also statutory, rights, including the rights to an implied warranty of hab-
itability, rent control, and such services as the landlord is obliged by stat-
ute to provide.  Cf. n. 7, *supra.*

As the Court of Appeals recognized, § 828 merely deprives appellant of a common-law trespass action against Teleprompter, but only for as long as she uses her building for rental purposes, and as long as Teleprompter maintains its equipment in compliance with the statute. JUSTICE MARSHALL recently and most aptly observed:

> "[Appellant's] claim in this case amounts to no less than a suggestion that the common law of trespass is not subject to revision by the State . . . . If accepted, that claim would represent a return to the era of *Lochner* v. *New York*, 198 U. S. 45 (1905), when common-law rights were also found immune from revision by State or Federal Government. Such an approach would freeze the common law as it has been constructed by the courts, perhaps at its 19th-century state of development. It would allow no room for change in response to changes in circumstance. The Due Process Clause does not require such a result." *PruneYard Shopping Center* v. *Robins*, 447 U. S., at 93 (concurring opinion).

### III

In the end, what troubles me most about today's decision is that it represents an archaic judicial response to a modern social problem. Cable television is a new and growing, but somewhat controversial, communications medium. See Brief for New York State Cable Television Association as *Amicus Curiae* 6–7 (about 25% of American homes with televisions—approximately 20 million families—currently subscribe to cable television, with the penetration rate expected to double by 1990). The New York Legislature not only recognized, but also responded to, this technological advance by enacting a statute that sought carefully to balance the interests of all private parties. See nn. 3 and 4, *supra*. New York's courts in this litigation, with only one jurist in dissent, unanimously upheld the constitutionality of that considered legislative judgment.

This Court now reaches back in time for a *per se* rule that disrupts that legislative determination.[12]   Like Justice Black, I believe that "the solution of the problems precipitated by . . . technological advances and new ways of living cannot come about through the application of rigid constitutional restraints formulated and enforced by the courts." *United States* v. *Causby,* 328 U. S., at 274 (dissenting opinion).   I would affirm the judgment and uphold the reasoning of the New York Court of Appeals.

---

[12] Happily, the Court leaves open the question whether § 828 provides landlords like appellant sufficient compensation for their actual losses. See *ante,* at 441.   Since the State Cable Television Commission's regulations permit higher than nominal awards if a landlord makes "a special showing of greater damages," App. 52, the concurring opinion in the New York Court of Appeals found that the statute awards just compensation. See 53 N. Y. 2d, at 155, 423 N. E. 2d, at 336 ("[I]t is obvious that a landlord who actually incurs damage to his property or is restricted in the use to which he might put that property will receive compensation commensurate with the greater injury").   If, after the remand following today's decision, this minor physical invasion is declared to be a taking deserving little or no compensation, the net result will have been a large expenditure of judicial resources on a constitutional claim of little moment.