Lorna R. GLASSMAN

v.

TOWNSHIP OF FALLS, et al.

Civ. A. No. 79–2733.

United States District Court,
E. D. Pennsylvania.

July 13, 1982.

Boris Shapiro, Epstein, Beller & Shapiro, Philadelphia, Pa., for plaintiff.

Joseph Goldberg, Frank, Margolis, Edelstein & Scherlis, Philadelphia, Pa., for defendants.

## OPINION *

LOUIS H. POLLAK, District Judge.

This action arises out of an unsuccessful attempt by the plaintiff to sell a parcel of land located in Falls Township, Bucks County, known as "Rock Run." On April 10, 1978, the plaintiff entered into an agreement of sale of Rock Run that depended, in part, upon the final approval by the Township of development plans for the parcel. When this approval was not forthcoming, the purchaser withdrew from the agreement and, apparently unable to recoup its purchase money deposit from plaintiff voluntarily, instituted a suit in this court for its return. *W–W Rock Run v. Glassman*, C.A. No. 79–2037 (E.D.Pa.). The plaintiff's defense in that action is that she had performed her part of the contract, but that Falls Township had illegally refused to acknowledge that the development plans were

---

\* On April 2, 1982, I filed an Order in this matter granting summary judgment to defendants. This opinion sets forth the reasons underpinning that Order.

approved as a matter of law. Plaintiff was granted leave to join the Township as a third-party defendant in that action.

On July 26, 1979, plaintiff filed this related action directly against the Township, its Board of Supervisors and the Township Solicitor. She alleged that in failing to acknowledge that the aforesaid development plans were approved and by imposing oppressive requirements as pre-conditions to the issuance of building permits, the defendants violated her federal constitutional rights under the due process, the equal protection and takings clauses. The new action was brought under 42 U.S.C. § 1983; plaintiff also alleged certain state law claims brought under this court's pendent jurisdiction.

Defendants then moved to dismiss the complaint on several grounds including, inter alia, failure to state a cognizable claim under § 1983. Rejecting the various grounds for dismissal put forward by defendants, I denied the motion to dismiss in a memorandum filed on March 31, 1980. I concluded that discovery would aid in the determination of whether plaintiff could indeed make out a constitutional claim for relief, and I suggested that defendants could renew their challenge to plaintiff's claim in the form of a motion for summary judgment at discovery's conclusion, if they then considered such a motion appropriate. A substantial period of discovery ensued, and a voluminous record of documentary and testimonial evidence has been assembled. Defendants now move for summary judgment under Rule 56, F.R.Civ.P.

## II.

Summary judgment is proper only when the record clearly establishes that no genuine issue of material fact remains to be tried and that the moving party is entitled to judgment as a matter of law. *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Any doubt respecting the existence of material factual issues must be resolved against the moving party, and all inferences from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Company,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

In view of these guidelines, the undisputed facts in this matter can be stated as follows.

In August, 1973, plaintiff filed with the Township of Falls an application for approval of site plans for the development of a project known as "Rock Run Village." At the time plaintiff filed these preliminary plans, her property, Rock Run, was zoned "G–A" (Garden Apartments) under the Falls Township Zoning Ordinance of 1955 which was then in effect. G–A zoning permitted the kind of development projected in plaintiff's site plans. However, after plaintiff submitted these plans, the Township Board of Supervisors rezoned Rock Run from G–A to "R–1", a classification which does not permit the type of development set out in the plans. The Board of Supervisors also rejected and returned plaintiff's site plans on the ground that they did not contain sufficient information. Plaintiff challenged both these actions by the Board through administrative and judicial channels, and on May 1, 1974, the Court of Common Pleas of Bucks County declared the rezoning of Rock Run illegal and void. On February 14, 1975, the same court entered an order deeming plaintiff's preliminary plans approved.

Acting through her then attorney, William J. Carlin, plaintiff filed with the Township on March 25, 1975 what she regarded to be her final plans for the development of Rock Run. Plaintiff never received formal notice that the Township regarded these plans as a submission for final approval. Neither the Township Board of Supervisors, nor its Planning Commission, set a date for a hearing on the plans, nor did plaintiff ever receive notice that the submitted plans had been formally approved or rejected.

Mr. Carlin, then and now a township solicitor for a community neighboring Falls Township and an attorney well-versed in local zoning procedures and practices, testi-

fied on deposition that his normal practice in situations such as this, where townships have allowed ninety days or more to pass without taking formal action on submissions for site plan approvals, was to "file an appeal" pursuant to section 508(3) of the municipalities Planning Act, 53 P.S. § 10508(3), with the Court of Common Pleas to secure a legal "determination that the plans were deemed approved" by action of law.[1] Deposition of William J. Carlin at 149–150. But in this instance Carlin decided on behalf of his client not to press the Township Board of Supervisors to take formal administrative action on the plans nor to seek a judicial determination that the plans were deemed approved by action of law. Instead, he decided simply to go forward with the next, and final, stage of ushering plaintiff's project through the local procedures, seeking the requisite building permits.

Carlin based his decision on several considerations. First, in his view, the Township's Board of Supervisors had already demonstrated an antagonism toward plaintiff's project by what Carlin regarded as its obstructionist actions on her preliminary plans. Second, Carlin had, by late June, 1975, begun to confer and correspond with the Township's Town Manager, Gus Bauer, regarding plaintiff's application for building permits, and Bauer had specified to him various measures which plaintiff had to take in order to receive building permits.[2]

Among the prerequisites for receiving a building permit from the township is prior approval of one's final site plans. Because Bauer did not specify final plan approval as a hurdle plaintiff had yet to clear to get her building permits, Carlin concluded that he and Bauer shared a common working assumption that the Township regarded or would regard the plans as constructively approved by virtue of § 508.[3] Carlin conceded in deposition that Bauer never confirmed that plaintiff's final plans had been approved, and "no township official, that is no elected township official, ever advised me that the [final] plans were approved." Carlin Deposition at 154. Nonetheless, encouraged by Bauer's cooperative spirit, Carlin decided that "dealing with the town manager" would prove a more expeditious way of moving plaintiff's project along than "getting hung up with the [Township] solicitor or with the Township elected officials [i.e., the Board of Supervisors]." *Id.* at 156.

Carlin continued to consult with the Township Manager and with other Township officials, including the Township Engineer and its Building Official, concerning the preparation of plaintiff's application for building permits until in mid-July, 1975, he encountered an obstacle in the form of a moratorium on the issuing of sewer permits by the Township's Sewer Authority. Because a sewer permit was among the prerequisites to receiving a building permit,

---

1. Section 508(3) provides:

   Failure of the governing body or agency to render a decision and communicate it to the applicant within the time [ninety days] and in the manner required herein shall be deemed an approval of the application in terms as presented unless the applicant has agreed in writing to an extension of time or change in the prescribed manner of presentation of communication of the decision, in which case, failure to meet the extended time or change in manner of presentation of communication shall have like effect, 53 P.S. § 10508(3).

2. These measures included, *inter alia,* "completion of an escrow account," obtaining sewer and water permits, and increasing the number of fire hydrants. Exhibit G to Plaintiff's Memorandum in Opposition to Defendants' Motion

for Summary Judgment; Carlin Deposition at 155.

3. Carlin recounted to Bauer the history of plaintiff's efforts to secure approval of her preliminary plans as well as the facts that plaintiff had submitted what she regarded as her final plans on March 25, 1975, and that the Township had not voted on the plans within ninety days. He told Bauer that, in his opinion, (1) the February 14, 1975 court order deeming plaintiff's preliminary plans approved obligated the Township to approve her final plans if they conformed substantially to the preliminary ones; and (2) the passage of ninety days after plaintiff's March 25, 1975 submissions without action by the Township meant that plaintiff's final plans were constructively approved under § 508.

plaintiff's endeavors toward that end were halted until the Sewer Authority lifted its moratorium in May, 1977.

On December 5, 1975, during the "sewer moratorium," the Township of Falls put into effect a new zoning code encompassing the whole township. Under the new code, Rock Run fell into a new zoning designation known as "medium-high density residential" ("MHR") which does not support the kind of condominium units which plaintiff sought to construct. However, section 508(4) of the Pennsylvania Municipalities Planning Act, 53 P.S. § 10508(4), provides, in relevant part, that

> When an application for approval . . . whether preliminary or final, has been approved . . . no subsequent change . . . in the zoning . . . plan shall be applied to affect adversely the right of the applicant to commence . . . the approved development . . . within three years from such approval.

Hence, plaintiff's condominium project appeared to be insulated from the zoning change wrought by the 1975 code at least until February 14, 1978.[4] By plaintiff's lights this three-year grace period was one which ought to have been considered tolled during the span of the Township's "sewer moratorium." However, plaintiff never applied for such an extension of her three-year grace period nor did she seek acknowledgment of her view of the issue from the Board of Supervisors.

The question whether plaintiff's grace period had expired, and the question whether —and, if so, when—plaintiff's project had received final approval, first arose as matters of concern between plaintiff and the Township in June-July, 1978. At that time, defendant David Moskowitz, then Township Solicitor, was engaged in drafting a "development agreement" between the Township and plaintiff.[5] Final approval of plaintiff's site plans were a prerequisite for this agreement as they were for the building permits. And, on July 28, 1978, in the course of completing a draft of the agreement, Moskowitz requested from Carlin certain information respecting Rock Run including, inter alia, the date on which plaintiff's plans received final approval. In response, Carlin provided Moskowitz with a copy of the February 14, 1975 Court of Common Pleas order deeming plaintiff's preliminary plans approved and a list of the plans which plaintiff submitted to the Township on March 25, 1975. At about the same time, Moskowitz also asked the Township official responsible for zoning code enforcement, Mr. Paul Ottey, to determine when plaintiff's plans received final approval, and Ottey informed him that the Township had no record of a submission of plans earmarked for final approval and no record of ever having granted final approval to plaintiff's plans. Moskowitz directed Ottey to continue searching the Township's records, and he then also directed the Township Engineer, Mr. Paul Piccoli, to check whether approved final plans had been filed by plaintiff with the County Recorder of Deeds.[6]

During August and early September, 1978, Carlin and Moskowitz had a number

---

**4.** I use as my point of reference the date when plaintiff's project received preliminary approval by action of the Court of Common Pleas because § 508(4) also provides that "the three year period shall be counted from the date of preliminary approval" in cases where a project has received such approval. 53 P.S. § 10508(4).

**5.** A "development agreement" in Bucks County usage is a document reciting, inter alia, the various public improvements which a developer undertakes to construct in connection with his development project and providing, inter alia, for some form of financial guarantee—whether in the form of a cash escrow fund or otherwise—for the cost of these improvements. See infra at 14–16.

**6.** Section 513(a) of the Municipalities Planning Act, 53 P.S. 10513(a), requires a developer to record finally approved plans with the Recorder of Deeds of the county in which the developer's project is to be constructed. It also provides that "the Recorder of Deeds of the County shall not accept any [plan] for recording unless such [plan] officially notes the approval of the governing body [in this case, the Township of Falls Board of Supervisors]."

On October 28, 1978, Piccoli wrote Moskowitz informing him that no plans were on file with the Bucks County Recorder of Deeds.

of conversations regarding the status of plaintiff's plans. In these conversations, Moskowitz also broached the question of whether plaintiff did not have a "§ 508 problem." More than three years had passed since her preliminary plans had been deemed approved; therefore, her project appeared to be no longer insulated from the new 1975 zoning code. Carlin put forward his opinion (1) that the township was obligated to approve the plans which plaintiff had submitted in March, 1975—in what she regarded as a request for final plan approval but which the township had not recorded as such, although its officials had used these plans in assessing what modifications and additions plaintiff had to make in order to receive building permits—as long as the plans substantially conformed to plaintiff's preliminary plans; and (2) that the township was obliged to extend plaintiff's § 508 grace period for an amount of time equal to the "sewer moratorium."

Moskowitz told Carlin in these conversations that he thought Carlin's view of these two issues was probably correct,[7] and indicated that he would be willing to recommend to the Board of Supervisors that they act accordingly. However, Carlin never requested that Moskowitz pursue the matter with the Board of Supervisors. Their discussions ceased abruptly as a result of the events which precipitated this suit. After the purchaser, W–W Rock Run Corporation, withdrew from its agreement of sale with plaintiff on September 28, 1978, and plaintiff's "deal was dead," plaintiff withdrew from the process of negotiating a development agreement with the Township, and

the § 508 questions which the attorneys had discussed became, from plaintiff's perspective, academic. Carlin Deposition at 180.

As I have already noted, plaintiff entered into the agreement of sale of her property, Rock Run, on April 10, 1978. The agreement set September 28, 1978 as the settlement date. Also included in the agreement were provisions requiring that the final plans for Rock Run be fully approved by the Township, and that all necessary building permits be available to the purchaser prior to settlement. Agreement of Sale, ¶ 8, Exhibit E to Defendants' Motion for Summary Judgment. On September 11, 1978, a Norman Powell, acting as a representative of the purchaser, W–W Rock Run Corporation, asked David Cooper, the Township's Zoning Officer and defendant Dale Saxman, a member of the Board of Supervisors, about the status of the project. Cooper and Saxman told Powell that plaintiff had not secured from the township final plan approval for the project and that building permits were, therefore, not then available. Powell reported back on these conversations to the principals of W–W Rock Run, and, partly on the basis of this report, the corporation withdrew from its agreement of sale with plaintiff.

Another factor which figured in W–W Rock Run's decision to withdraw from the agreement was the fact that the draft development agreement prepared by Moskowitz imposed a sizeable cash escrow requirement on the would-be developer of Rock Run.[8] Shortly before the settlement date,

**7.** Both attorneys regarded plaintiff's situation as presenting novel questions of § 508 law and their conversations were couched in terms of predicting how the Commonwealth Court would treat the two issues. Carlin Deposition at 171–3, Affidavit of William Carlin dated August 18, 1981; Deposition of David H. Moskowitz at 75–76; Affidavit of David H. Moskowitz dated September 14, 1981.

**8.** Specifically, the draft agreement required the developer of Rock Run to deposit a cash escrow fund of six hundred forty-six thousand two hundred fifty dollars ($646,250.00) which consisted of five hundred sixty-eight thousand seven hundred dollars ($568,700.00) to guaran-

tee the construction of roads and improvements (Exhibit "C" to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment), and seventy-seven thousand five hundred fifty dollars ($77,550.00) to reimburse the Township for future engineering, legal and administrative fees (*id.*). The five hundred sixty-eight thousand seven hundred dollars ($568,700.00) included an administrative cost of ten percent, and the agreement also provided that twenty percent of the estimated improvement costs was to be withheld and retained for a period of two years after acceptance of the improvements to insure proper maintenance (*id.*).

September 28, 1978, the purchaser protested to Mitchell Stanner, plaintiff's real estate broker for Rock Run, about the cash escrow requirement, and Stanner asked the Township code enforcement official, Paul Ottey whether a bond or letter of credit could be substituted for cash.[9] Ottey informed him that the Board of Supervisors would insist on cash. At about the same time, plaintiff's husband, Donald Glassman, raised the same question with the Solicitor, Moskowitz, and received the same response. Glassman also inquired whether the escrow amount and particularly the administrative fee were negotiable, and Moskowitz replied that they were not.

The common practice in this period among developers negotiating development agreements with Falls and other townships in Bucks County when they were dissatisfied with any of the draft terms of such agreements was to meet with the Township's Board of Supervisors and attempt to negotiate changes in the drafts.[10] Although aware that this avenue was open to her, plaintiff never availed herself of it. Moskowitz only mailed the draft to Carlin on September 5, 1978, and by September 28, as I have noted, plaintiff's deal with W–W Rock Run was dead, and with its plaintiff's concern regarding the draft's contents.

### III.

As I have observed, the complaint alleges that defendants' conduct violated her rights under three provisions of the Constitution: the takings clause, the due process clause, and the equal protection clause. At oral argument, counsel for plaintiff withdrew plaintiff's claim under the takings clause and announced that she would rely solely on her two other constitutional claims.[11] Counsel also announced

9. In early 1978, the Board of Supervisors directed Mr. Moskowitz to prepare for their consideration a general draft form for development agreements embodying his views of the best, and most "stringent," manner of dealing with a number of "policy decisions" which development agreements characteristically raise. These included, inter alia, "the kinds of escrow that would be requested ... interest in the escrow deposits, administrative fees..." Moskowitz Deposition at 39–40. Moskowitz prepared such a draft form, and the Board endorsed it to the extent that, as a trial run, they directed the Solicitor to use it as a model for the next few agreements he was then about to draft. Among these was the draft agreement for Rock Run. In requiring a cash escrow deposit, the Rock Run draft agreement was no different from the other draft agreements Moskowitz prepared at that time. Nor did it deviate from the others in requiring ten percent of the estimated improvement costs to cover administrative expenses or in requiring that twenty percent of the estimated improvement costs be retained by the Township for two years. Moskowitz Deposition at 41; Draft of Development Agreement between Township of Falls and David J. Schrenk at 10–A and 21; Draft of Development Agreement between Township of Falls and Theodore Malpezzi at 2 and 20; Draft of Development Agreement between Township of Falls and Jaspar and Ruth DiSanto at 12–A and 25; see also Carlin Deposition at 178–182.

10. Both Moskowitz and Carlin testified that in this period the Township's Board of Supervisors customarily met and negotiated with developers respecting the terms of development agreements. Carlin also testified that he represented another developer, Theodore Malpezzi, who entered into a development agreement prepared by Moskowitz at the same time as the Rock Run draft. Carlin testified that he was successful in negotiating certain changes in the Malpezzi agreement but that the Township persisted in its requirement of a sizeable cash escrow deposit. Calvin Deposition at 179.

11. Relinquishing her takings clause claim was surely warranted on plaintiff's part. Even assuming that the facts were as plaintiff alleged, she would not succeed in making out a violation of the takings clause by defendants. The wrongful barriers to plaintiff's project allegedly thrown up by defendants are not alleged to have deprived plaintiff of "all reasonable uses of [her] land," *C.F. Lytle Co. v. Clark,* 491 F.2d 834, 838 (10th Cir. 1974); nor would the record support such an allegation. It is undisputed that plaintiff was, throughout the period of allegedly illegal obstruction, and remains today, free to build "single family, detached duplex houses" on Rock Run. Affidavit of David Cooper, ¶¶ 8, 9. The record also makes plain that Rock Run, at the time this suit was filed, still possessed substantial market value, notwithstanding the impediments to certain kinds of development which then existed. Deposition of Donald Glassman at 247; Deposition of Mitchell W. Sauner at 58–59. Hence, it is inconceivable that plaintiff could make out the drastic degree of "diminution in value" which the Supreme Court has long held to be a necessary predicate for a viable takings clause cause of action in cases like this one which involve

that plaintiff's due process claim rests upon defendants' conduct respecting the site plans plaintiff submitted on March 25, 1975, and that her equal protection claim is grounded on the various escrow requirements contained in the draft agreement prepared by defendant Moskowitz.[12]

### A. *Plaintiff's Due Process Claim*

The crux of plaintiff's due process claim is set out in the following paragraphs of her complaint:

35. In violation of its clear statutory mandate and in an effort to deprive plaintiff of due process of law, the defendants have refused to issue approval of the final plans for the development of plaintiff's property or acknowledge that final plans have been deemed approved by operation of law, but instead have illegally withheld approval and maintained that said final plans have not been deemed approved by operation of law.

36. The action of the defendants in failing to acknowledge the approval of the final plans submitted by the plaintiff is contrary to applicable Township Ordinances and the laws of the Commonwealth of Pennsylvania and was and is being done solely for the purpose of denying plaintiff the lawful development of her property.

38. Defendants, acting individually and in concert, have undertaken to frustrate, hinder, delay and prevent the development of plaintiff's property solely for the purpose of inflicting economic harm upon plaintiff under the guise of law.

Plaintiff, then, does not complain of the rules created by statute and local ordinance to govern the approval of final plans.[13]

Rather, she alleges deliberate transgressions of those rules, and contends that these alleged transgressions violated her right to due process.

■ It is a doctrine of relatively ancient vintage that "[m]ere violation of a state statute does not infringe the federal constitution." *Snowden v. Hughes,* 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944); *see also Owensboro Water Works Company v. Owensboro,* 200 U.S. 38, 47, 26 S.Ct. 249, 252, 50 L.Ed. 361 (1906). The Supreme Court has long observed this distinction between state law violations giving rise to causes of action in state courts and constitutional violations cognizable in federal courts; the distinction has not been eroded by the sea-change in due process analysis brought about by such cases as *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1971), and *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1974). Those cases fashioned a two-step due process analysis inquiring first whether an individual has a legitimate claim to "liberty" or "property" and, second what process is due if he is deprived of such a claim. For purposes of the first inquiry, the Court has turned to state and local law as potential sources of "liberty" and "property" interests. But for purposes of the second inquiry, it has measured the process that is due by looking to federal constitutional standards. *See Vitek v. Jones,* 445 U.S. 480, 490 n.6, 100 S.Ct. 1254, 1262 n.6, 63 L.Ed.2d 552 (1980).

The independent federal standard which applies in cases such as this one—where officials are charged with transgressing the rules intended by local or state lawmakers to govern their conduct—is one of non-arbi-

---

neither physical invasion nor permanent occupation of private property by a public authority. *See Loretto v. Teleprompter Manhattan CATV Corp.,* —— U.S. ——, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978) (citing cases); *see also Rogin v. Bensalem Twp.,* 616 F.2d 680, 691–92 (3d Cir. 1980).

12. I quote the relevant portions of the complaint *infra* at 15–16 and 23 n.18.

13. The pertinent state statutory provisions are contained in 53 P.S. § 10508; the local ordinance which governed plan approval at the time in question was the Falls Township Land Subdivision Ordinance of May 4, 1954, Section A, Defendants' Motion for Summary Judgment, Exhibit "K".

trariness.[14] *Block v. Potter,* 631 F.2d 233 (3d Cir. 1980); *South Gwinnet Venture v. Pruitt,* 491 F.2d 5, 7 (5th Cir.) (en banc) *cert. denied,* 416 U.S. 901, 94 S.Ct. 1625, 40 L.Ed.2d 119 (1974) ("the only question which the federal district courts may consider is whether the action of the zoning commission is arbitrary and capricious").

In addition, the individual defendants, the Solicitor and the Supervisors, are entitled to a qualified immunity which is not enjoyed by the Board or the Township. *Owens v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Thus, with respect to the individual defendants plaintiff must be capable of showing intentional violations of her rights or reckless disregard for them. *Id.*

Plaintiff has surely alleged such intentional infringement of her right to fair treatment at defendants' hands; she has alleged malicious treatment meted out for impermissible purposes unrelated to "the general welfare." *See South Gwinnet Venture, supra* at 7; *Block v. Potter, supra* at 236. But, for reasons which follow, I have determined that plaintiff has not mustered evidence sufficient to raise her allegations to the level of a factual dispute, and I have concluded on the basis of the undisputed facts that defendants are entitled to summary judgment on plaintiff's due process claim.

1. The Defendant Board of Supervisors and its Defendant-Members, Chimera, Ianni, Saxman, Seller and Vislosky

The Board of Supervisors quite reasonably raise a query at the threshold of plaintiff's claim against it: What action or conduct on the Supervisors' part does plaintiff contend to have been tainted by arbitrariness or malice? More precisely, where, in the factual narrative which emerges from the record, does one find any actions or omissions by the Board which correspond to plaintiff's allegations of refusal by them to approve plaintiff's final plans or to acknowledge approval of the final plans by operation of § 508? I am unable to find any such actions or omissions.

It is undisputed that in late June, 1975, when ninety days had passed from the filing of plaintiff's final plans, plaintiff, through her attorney, decided not to request formal administrative action respecting her plans by the Supervisors or to seek a judicial determination that they were deemed approved. Instead, she chose to rely on the acquiescence of certain of the Township's non-elected administrative officials in going forward with the next stage of the application procedures.[15] Hence, in this initial period, no occasion arose for the Supervisors to act in connection with plaintiff's plans—in an arbitrary fashion or otherwise.

In the entire time span from March, 1975 to September, 1978, the record reveals only one action respecting plaintiff's plans by the Board of Supervisors. This occurred in early 1978 when, at plaintiff's behest, the Board directed the Township Solicitor, Mr. Moskowitz, to draft a development agreement for plaintiff's project. In preparing this draft agreement, Moskowitz initiated his search for final approved plans and the date of their approval, and this search, in turn, led to the correspondence and conversations between him and plaintiff's attorney which I have recounted.

Here, again, it is undisputed that plaintiff never sought from the Board of Supervisors, either directly or via Moskowitz, acknowledgment of, or any decision upon, plaintiff's claim that her final plans were "approved" by operation of § 508. Plaintiff stopped pursuing her application with-

---

**14.** It is undisputed, and I assume for the purposes of this motion, that (1) defendants were acting under color of law; and (2) the due process clause applies to defendants' conduct.

**15.** It is also undisputed that (1) plaintiff did not ask any of these officials to confirm by consultation with the Supervisors that they ac-

quiesced in plaintiff's view that the plans were constructively approved by operation of § 508; and (2) plaintiff was never led to believe by the Supervisors, or any other official, that the Supervisors acceded to, or indeed were aware of, her views on this score.

out having initiated any contact or negotiations with the Board regarding the development agreement.[16] The record simply lacks a jot of evidence from which a fact-finder could infer that at any time during these, no doubt, anxious months in the summer and early fall of 1978, plaintiff suffered an arbitrary action or refusal to act by defendant Board of Supervisors respecting her ill-starred final plans.

With one exception, the record is silent with respect to distinct acts by the individual defendant-members of the Board of Supervisors, in their official capacities or otherwise. The exception is Mr. Dale Saxman. As I have noted, on September 11, 1978, Saxman told an emissary from W–W Rock Run Corporation, who had been sent to inquire about the status of plaintiff's project with the Township, that plaintiff had not secured final plan approval. In so doing, Saxman merely stated to Powell the upshot of the search for submitted and approved final plans which Moskowitz had initiated in the Township offices. In light of the undisputed facts already recited, a fact-finder could not reasonably infer from this statement, as plaintiff would have me infer, that Saxman, either individually or in concert with other defendants, was deliberately contriving to thwart plaintiff's project.

## 2. Defendant David Moskowitz

Nothing in plaintiff's pleadings or submissions points me toward any conduct on Mr. Moskowitz's part respecting plaintiff's site plans which plaintiff asserts to have been arbitrary. On the basis of the undisputed facts, I conclude that neither Moskowitz's search of the Township records nor his conduct in discussions and correspondence with plaintiff's attorney was colored by any discernible arbitrariness or bad faith.

## 3. Defendant Township of Falls

Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), teaches that a municipality may be found liable under § 1983. Monell also teaches that to hold a municipality liable under § 1983 a plaintiff must demonstrate (a) either a formal policy, or an informal custom of such long duration as to have the force of law, which (b) causes an unconstitutional deprivation of civil rights by one of its employees. Id. at 691–94, 98 S.Ct. at 2036–37.

Plaintiff contends that the Township infringed the due process clause by dint of the conduct of various of its administrative officials in first appearing to acquiesce in plaintiff's view that her final plans were "approved" and then, in response to Moskowitz's queries, stating that they could find no record of plaintiff's submission of final plans for Township approval. No doubt this congerie of events was upsetting to plaintiff. However, I have carefully considered the undisputed facts which underlie plaintiff's contention, and I conclude that the narrative which emerges is a tale of some bureaucratic sloppiness but not "arbitrary and capricious" conduct that runs afoul of the due process clause.[17] Because I have determined that the Township employees' conduct worked no deprivation of plaintiff's right to due process, I need not consider what bearing Township policy or custom may have had on that conduct.

## B. Plaintiff's Equal Protection Claim

The allegations which comprise plaintiff's equal protection claim are set out in the

---

**16.** Thus, whether or not the Board had such a clear duty to acknowledge that plaintiff's plans were "deemed approved" that a refusal to do so, forcing plaintiff to seek judicial relief in the state courts, would have been "arbitrary" under the due process clause, cf. 6th Camden Corp. v. Evesham Twp., Burlington Cty., supra, 420 F.Supp. 709 at 723–4; but see Harrison v. Brooks, 446 F.2d 404, 406–07 (1st Cir. 1971); the undisputed fact remains that the Board was never presented with an opportunity to undertake this "duty."

**17.** I also conclude that, contrary to plaintiff's somewhat vague allegations, no fact-finder could reasonably infer from these events that any of the various administrative officials were conspiring with the named defendants to deprive plaintiff of her civil rights.

margin.[18]  Essentially, plaintiff contends that the cash escrow requirement and other financing provisions included by Solicitor Moskowitz in the agreement for Rock Run[19] imposed on her project conditions which the Township had imposed on no other developers.  By imposing these conditions, and asserting that at least some of them were "non-negotiable," the defendants, so plaintiff claims, infringed her constitutional right to equal protection.

■■■  In order to sustain her claim, plaintiff must be capable of showing "purposeful discrimination" on defendants' part aimed at defeating her ambitions for Rock Run.  *Kadar Corp. v. Millbury*, 549 F.2d 230, 236 (1st Cir. 1977); *Harrison v. Brooks, supra* at 407; *Williams v. Patton*, 410 F.Supp. 1 (E.D.Pa.1976); *see also Snowden v. Hughes, supra*.  I have culled the pleadings, affidavits, exhibits and depositions, and I find no evidence which could support, either directly or by way of reasonable inference, a finding of intentional discrimination by any of the defendants based on the escrow requirements in plaintiff's development agreement or any statements by defendants about those requirements.  In short, the undisputed facts compel the conclusion that defendants are entitled to summary judgment on plaintiff's equal protection claim.

■■■  I find no evidence which could support an inference that in early 1978 when the Board of Supervisors decided to adopt Solicitor Moskowitz's prototype development agreement, the Board, or any of its members, or Moskowitz, intended to single out plaintiff for discriminatory treatment.  The undisputed evidence runs in a contrary direction; it supports the conclusion that these defendants, in fashioning and adopting the prototype agreement, implemented a set of policy decisions which they intended to apply to developers generally.  Likewise, I can find neither evidence nor the promise of evidence from which a fact-finder could conclude that the particular requirements contained in the draft agreement for Rock Run reveal anything other than a good-faith assessment of what provisions and financial requirements were necessary to protect the Township's interests.[20]

### Conclusion

■■■  In over two years, plaintiff has proven unable to produce evidence sufficient to transmute the "opprobrious epi-

---

**18.**  The following are the allegations in the complaint which comprise plaintiff's equal protection claim:

  39.  Defendants have further acted to frustrate, hinder, delay and/or prevent the development of plaintiff's property by requiring unreasonable, discriminatory, illegal and improper escrow deposits for public improvements as a pre-condition to the issuance of building permits for the development of Rock Run.  These acts consist of the following:

  (a) Requiring the escrow to be in the form of cash in the amount of approximately One Million ($1,000,000.00) Dollars rather than in the form of a Bond or other non-cash type of security;

  (b) Requiring that the interest earned on the cash escrow deposit accrue to the benefit of the Township rather than the developer;

  (c) Requiring a twenty (20%) percent escrow deposit for maintenance and repair whereas the Township Ordinance sets a requirement of only ten (10%) percent;

  (d) Requiring a fifteen (15%) percent administrative and legal escrow deposit whereas the Township Ordinance only requires a ten (10%) percent deposit;

  (e) Calculating the amount of the administrative and legal expenses in such a manner that provides for excessive legal and administrative fees;

  (f) Such illegal and discriminatory requirements have been imposed upon other developers by the Township.

**19.**  I have set out the pertinent draft provisions, *supra*, at 14 n.9.

**20.**  That certain of these provisions were more stringent than required by the governing ordinances, and that certain of them were, comparatively, more stringent than conditions imposed on other contemporaneous development projects—a fact plaintiff has not shown, but which I will assume for deciding this motion— are simply not enough to raise a genuine issue for trial on the question of whether defendants subjected plaintiff to the kind of purposeful discriminatory treatment which the equal protection clause proscribes.  *See Kadar Corp. v. Millbury, supra; 6th Camden Corp. v. Evesham Township, Burl. Cty., supra* at 723–5; *Creative Environments, Inc. v. Esterbrook*, 491 F.Supp. 547, 551–3 (D.Mass.1980).

thets," *Snowden, supra* at 11, 64 S.Ct. at 402, of malice and discrimination in her § 1983 complaint into factual issues warranting a trial. Instead, she has offered no more than conclusory allegations and suspicions arising out of her disappointment that the Rock Run "deal" fell through. It is time to put away that disappointment.[21]

See also, D.C., 536 F.Supp. 538.

---

**21.** As noted on page one of this opinion, I filed an order on April 2, 1982 granting defendants' motion for summary judgment. That motion was directed at plaintiff's § 1983 claims. However, the granting of defendants' motion destroyed the jurisdictional foundation for plaintiff's pendent state law claims. Accordingly, in a separate order filed today, those claims are dismissed.