Smith, J.
(dissenting). When the City put side fill on plaintiffs’ property to shore up a roadway, it took their property for public use and plaintiffs are entitled to be compensated for the taking. Contrary to the instant interpretation of the majority, neither the New York City Charter nor the common law is a preexisting limitation on plaintiffs’ title that would authorize a taking of plaintiffs’ property without compensation. I, therefore, dissent.
Under the reasoning of the majority, plaintiffs must suffer *15 "the City’s dumping of side fill on 2,400 square feet of plaintiffs’ property” (majority opn, at 5) solely to create additional lateral support that will "protect” and "maintain” an artificially created roadway dedicated to the public. The majority finds the physical invasion complained of to be permissible under section 2904 of the New York City Charter and as an extension of a landowner’s obligation to provide such support for public roadways.
In 1978, the Board of Estimate raised the legal grade of College Point Boulevard from 9.1 to 13.5 feet. A portion of that public roadway abutted a lot at 31-25 College Point Boulevard which plaintiffs purchased in 1988. Because a map reflecting the legal grade had previously been duly filed in the office of the Queens Borough President, plaintiffs arguably were on constructive notice that their property was approximately 4.5 feet short of the legal grade of the adjacent roadway.
In 1990, work finally began to regrade the roadway. Construction on the street included installing a new sewer system and water main. In March 1990, plaintiffs filed the instant action against the City alleging that due to the "reconstruction of street” abutting their property, "the highest and best use of the property has been diminished resulting in a taking” by the City. Later that same month, following completion of the sewer system and water main installation, the City’s Department of Transportation (DOT) requested plaintiffs’ "consent” to "permit the placing and sloping” of side fill on plaintiffs’ property to "protect” and "maintain” the street.[1]
Although DOT offered to perform the construction at no charge if consent were timely returned, DOT warned that it *16 would proceed even without consent, "the cost of which shall be due and payable and shall constitute a lien against your property.” The notice stated that plaintiffs would "be responsible for the removal and relocation of landscaping, fences, walks, stairs and other structures, whether or not they are attached to a building, which may be disturbed due to fill operations.” The notice further provided that any consent to the placement of side fill on plaintiffs’ property "in no way constitutes a waiver of or release from your obligation to construct and/or maintain the sidewalk abutting your property pursuant to Section[s] 2903 & 2904 of the New York City Charter.” Plaintiffs never responded to the notice.
The regrading of the roadway began in June 1990. Rather than leave an almost five-foot disparity between the lower grade of plaintiffs’ property and the neighboring roadway, the DOT proceeded to dump side fill on that portion of plaintiffs’ property that abutted the roadway (about 2,390 square feet) until the two were level. The DOT also built permanent driveway ramps from College Point Boulevard to plaintiffs’ property which provided greater roadway access. The driveway ramps were built at no cost to plaintiffs. Following the regrading project, plaintiffs filed a notice with the New York City Comptroller for a "claim for damages by reason of a change of grade” pursuant to title 3, §§ 3-316 through 3-320 of the Administrative Code of the City of New York.
The plaintiffs moved for summary judgment and an order directing an immediate trial on damages on the takings claim against the City. The City cross-moved for summary judgment in its favor. Supreme Court denied plaintiffs’ motion but granted the City’s cross motion and dismissed the plaintiffs’ claim. In so holding, the court stated that plaintiffs’ claim must fail because "the City could have compelled plaintiffs to fill the property to legal grade at their, own expense pursuant to New York City Charter § 2904.”
The Appellate Division affirmed and held that the side fill did not constitute a "permanent physical occupation” and plaintiffs’ property rights "were not effectively destroyed by *17 the City’s actions.” (204 AD2d 711.) The Appellate Division held that no taking had occurred because "the fill was necessary to support the street and prevent erosion, and there is no evidence that the placement of the fill had an impact on the plaintiffs’ business or their use of the property” (id.).
In affirming the order of the Appellate Division, a majority of this Court adopts the reasoning of Supreme Court and holds that "the City did not take any property interest from plaintiffs for which compensation is due” because the "City acted pursuant to a long-standing common-law principle and in conformity with a provision of its Charter that was in force when plaintiffs acquired title to their property.” (Majority opn, at 4.)
Contrary to the view of the majority, the placing of side fill on the plaintiffs’ property constituted a taking of private property for public use which requires compensation. Moreover, neither the common law nor section 2904 of the New York City Charter supports the argument of the majority.
In Loretto v Teleprompter Manhattan CATV Corp. (458 US 419), the plaintiff filed a takings claim against the placement of cable television equipment on her roof pursuant to a statute which provided that "a landlord may not 'interfere with the installation of cable television facilities upon his property or premises’ ” (458 US, at 423). The Court found in favor of the plaintiff. However, the Court distinguished the "permanent physical occupation” by the cable equipment in that case from permissible regulations affecting a property owner such as the requirement to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers and the like.
Respondents argue that the "lateral support” obligation here falls within the latter category of permissible regulations. However, the regulations described by the Loretto Court are all directed toward the public safety and health of those persons invited to the landowner’s property by the landowner. They do not benefit the public-at-large. In the present case, the plaintiffs’ personal property and obligations are dedicated to the public benefit without regard to plaintiffs’ property interests. Indeed, the Loretto Court recognized this distinction when it stated that the statute at issue there "might present a *18 different question” if it required landlords to provide cable installation if a tenant so desired (458 US, at 440, n 19).[2]
Importantly, the Loretto Court reiterated the rule that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve” (458 US, at 426). The long-standing application of this rule is undeniable. In 1879, this Court stated that "there never can be any necessity under the police power or the law of necessity to permanently appropriate land to the public use without compensation” (Matter of Cheesebrough, 78 NY 232, 237). More recently, the Supreme Court stated that "[i]n general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation” (Lucas v South Carolina Coastal Council, 505 US 1003, 1015).
In Matter of Cheesebrough (78 NY 232, supra), a property owner charged that newly enacted legislation to provide for proper drainage of lands within New York City was unconstitutional because the law made no provision for compensating the owners for the land taken for the "acquisition of an easement” in lands for the construction and maintenance of drains. This Court agreed and stated:
"It was a work not so much necessary for the lands of the petitioner as for other lands requiring drainage through his. It is believed that no case can be found justifying the permanent appropriation of land without compensation under such circumstances. * * * The statute * * * did not and no statute could confer authority to construct this drain through the land of the petitioner without his consent and without compensation to him for the land taken” (id., at 238).
Such is the rule even where the legislation "did not deprive the owner of the fee and gave the public but an easement” (People ex rel. Williams v Haines, 49 NY 587, 590; see also, People ex rel. Cook v Nearing, 27 NY 306).
*19 Although government may not decree land anew such that a permanent physical occupation may be sustained without compensation, the Supreme Court has noted that government may assert a "permanent easement that was a pre-existing limitation upon the landowner’s title” (Lucas v South Carolina Coastal Council, 505 US, at 1028-1029; see also, Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 NY2d 603 [decided today]). Clearly, a "pre-existing limitation” may not be based upon subsequently enacted legislation or novel interpretations of State law (see, Lucas v South Carolina Coastal Council, 505 US, at 1029 ["Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State’s law of property and nuisance already place upon land ownership”]).
Obviously, the placement of enough side fill across 2,400 square feet of plaintiffs’ land to raise it almost five feet higher is a physical invasion. Moreover, there can be no argument that the invasion is temporary in any way. Thus, the placing of side fill on the plaintiffs’ property constituted a taking. Accordingly, under the guidance of Lucas, the circumstances presented here may only be validated without compensation if respondent can show that a "pre-existing limitation” upon plaintiffs’ title may be found in State law (505 US, at 1031).
In Lucas, the Supreme Court advised that a showing of "background principles” of property law that may create such a preexisting limitation upon title must stem from more than "the conclusory assertion” of "a common-law maxim such as sic utere tuo ut alienum non laedas” (505 US, at 1031; see, Black’s Law Dictionary 1380 [6th ed] ["one should use his own property in such a manner as not to injure that of another”]). Contrary to the instruction of the Supreme Court, the majority holds that a newly expanded obligation under that same common-law principle provides a basis for validating the permanent physical occupation at issue here.
Neither New York City Charter § 2904 nor the common law supports the argument of the majority. Section 2904 devolves from section 230 which became part of the City Charter in 1962. The two sections, 2904 and 230, do not differ in any material respect. What is significant is that the legal grade of the street was changed in 1978, well after the enactment of section 230. In other words, when section 230 became law, there was no indication that it would be applied to require a private property owner to shore up this or any other public roadway.
*20 Section 2904 of the City Charter defines certain landowner obligations under the auspices of the transportation department such as maintaining sidewalks. Whether the statute is truly the "contemporary formulation” of the common-law lateral support obligation as noted by the majority is certainly open to debate (see, e.g., City of Rochester v Campbell, 123 NY 405, 412 [no obligation to repair streets or sidewalks rests upon lot owners at common law]; Village of Fulton v Tucker, 3 Hun 529, 531-532 ["The owner of adjoining territory has no greater duty in regard to keeping sidewalks in repair, than he has in regard to other parts of the highway”]). Moreover, the statute does not address the circumstances here. The provision reads, in relevant part:
"Duties and obligations of property owner with respect to sidewalk flags, fencing of vacant lots and filling of sunken lots or cutting down of raised lots. The owner of any property at his own cost, shall * * *
"(2) fence any vacant lot or lots comprising part or all of such property and fill any sunken lot or lots comprising part or all of such property or cut down any raised lot or lots comprising part or all of such property whenever the transportation department shall so order pursuant to standards and policies of the transportation department. In the event that the owner fails to comply with the provisions of this section, the transportation department may provide for the doing of same at the expense of the owner in the manner to be provided by local law.”[3]
The plain language of section 2904 refers to "sunken” lots.[4] The majority’s position necessarily hinges upon an interpretation of this term. While "sunken” may mean "situated or lying on a lower level,” its primary meanings are listed as "having *21 sunk or been sunk beneath the surface” or "having sunk to a lower level” (Random House Webster’s College Dictionary 1339 [1991]). The Second Edition of the Oxford English Dictionary provides several definitions of the word, only two of which are relevant. One definition is "that has sunk below the usual or general level, subsided” (see, 17 Oxford English Dictionary 197 [2d ed]). Another meaning is given as "In modern technical use, applied to a surface area lowered, or to an object let in, so as to lie below the general surface, or to work of which depression of level is a general feature.” Clearly, plaintiffs’ land may not be characterized as "sunken” under the latter definition. Thus, the primary definition of the word "sunken” implies that something has happened to the lot in question which might therefore require repair (see, Italian Sav. Bank v Le Grange, 169 App Div 120, 123, 125 [referring to "low and swampy” ground which new purchasers filled as "sunken lots”]). Such a reading comports with the traditional lateral support obligation.[5]
The reference to "sunken lots” is amenable to two differing yet reasonable interpretations. Notably, the majority fails to offer a shred of legislative history to support its interpretation of this ambiguous phrase. Instead, the majority offers a meaning that is inconsistent with the same common-law principle which the majority contends is the root of the provision itself. Under Lucas, the respondent must offer some specific support, from any source whatsoever, that the City Charter has ever been applied in this manner. No such evidence comes from respondent, the party with the burden of proof to demonstrate that background understandings of State law serve to create a preexisting limitation on plaintiffs’ title.
The protections guaranteed under the Constitution do not support the majority’s decision to read a statute that is, at best, ambiguous in such a way as to do away with the traditional right to property. This interpretation to validate an otherwise impermissible taking is clearly "beyond what the *22 relevant background principles would dictate” (Lucas v South Carolina Coastal Council, 505 US, at 1030).[6]
The doctrine of lateral support restricts the withdrawal of the support of any land naturally necessary to maintain another’s land in its natural condition (Restatement [Second] of Torts § 817; 1 Am Jur 2d, Adjoining Landowners, § 40). As stated in Hay v Cohoes Co. (2 NY 159), "it is better that one man should surrender a particular use of his land, than that another should be deprived of the beneficial use of his property altogether, which might be the consequence if the privilege of the former should be wholly unrestricted” (2 NY, at 161).
This common-law principle is limited to the support of land in its natural state when asserted by owners of adjacent property. Nevertheless, in the case of a public roadway, the common-law obligation is extended to include the sustenance of lateral support for even the artificially created street. As stated in Finegan v Eckerson (26 Misc 574), "although, as claimed by the defendants, the right to lateral support between adjoining owners does not include the right to the support of an artificial structure, that doctrine has no application to the case of a highway” (id., at 575). While a certain amount of excavation might be permissible when land is in its natural state, the added pressure of an artificial structure will further limit what an adjoining landowner might do (see, Milburn v Fowler, 27 Hun 568, 569-570; 3 Warren’s Weed, New York Real Property, Lateral and Subjacent Support, § 2.04 [1] [4th ed]).
The majority cites Village of Haverstraw v Eckerson (192 NY 54) as authority for its position that the common law does not permit compensation here. The case is not applicable. While *23 the majority relies upon Village of Haverstraw to create plaintiffs’ obligation to raise their own land to the legal grade of the street, the express holding of that case is that a landowner could not do certain acts upon his own property that would injure a public street. As the Court concluded:
"My conclusion is that, whether the acts of persons menace the condition of a highway in a direct manner, or indirectly, by so digging, or excavating, upon the adjacent lands as to affect the lateral support and to cause, or to threaten, the subsidence of the highway, the exercise of the equitable power of the court may, properly, be invoked by the municipality in restraint of their continuance” (192 NY, at 60).
Thus the Haverstraw Court says nothing about the placing of side fill on property without the owner’s consent or about any compensation due an owner as a result. The holding in Haverstraw simply applies the general obligation of lateral support to a roadway, an artificial structure which would not fall under an ordinary application of the doctrine (see, Adlin v Excelsior Brick Co., 129 App Div 713, 715 ["It is not disputed that the rule of lateral support binds the owner of land along a highway, and that if he wrongfully excavate so close as to cause the highway to cave in he is liable for any damage caused thereby”]; Milburn v Fowler, 27 Hun 568, 570, supra [one may not dig on his own land "so as to cause a subsidence or destruction of the highway itself’]; City of Troy v Murray, 128 Misc 419, 421 [defendant "has no right to further threaten the destruction of the streets in question, as the removal of sand and gravel has now reached the point that further excavation will result in the caving in of the streets at some points”]).
However, the majority reads the "contemporary formulation” of the lateral support obligation much more broadly than any of our authorities have ever seen fit to do. Under the facts of this case, the City merely regraded a roadway, thereby rendering the area higher than plaintiffs’ property. The "existing understanding” of the obligation of lateral support clearly does not apply here when it is the City that has caused the disparity. Moreover, there is no indication that the common-law doctrine of lateral support negates plaintiffs’ fundamental property interest in resisting a permanent physical occupation *24 by the City.[7] Indeed, where a change in the grade of a public street led to damage to property, this Court has approved compensation to plaintiff only for a physical encroachment for a foundation wall (McCabe v City of New York, 213 NY 468). General damage to the property due to the regrading was not compensable.
Clearly, this common-law principle does not support the proposition advanced by the majority. As the Supreme Court held in Pumpelly v Green Bay Co. (13 Wall [80 US] 166):
"for a consequential injury to the property of the individual arising from the prosecution of improvements of roads, streets, rivers, and other highways, for the public good, there is no redress * * * But we are of opinion * * * that it remains true that where real estate is actually, invaded by superinduced additions of water, earth, sand, or other material, * * * it is a taking, within the meaning of the Constitution” (13 Wall [80 US], at 180-181).
The ultimate question a court must answer upon a "taking” claim is whether government action inevitably forces property owners "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole” (Armstrong v United States, 364 US 40, 49). The majority seems to argue that there has been no taking here because plaintiffs never had unrestricted title to the portion of the premises on which side fill was placed. The argument appears to be that the New York City Charter and the common law both prevented plaintiffs from having unrestricted title to this portion of the premises as part of the bundle of rights they acquired (see, Matter of Gazza v New York State Dept. of Envtl. Conservation, supra).
The argument fails. Simply, adjoining property owners do not have an obligation under the common law to encumber their property for the lateral support of a raised road. Although the referenced provision of the City Charter sets forth certain obligations of a landowner which were not required under the common law, such obligations do not reach the circumstances here. Other than general language regarding the "broader” obligation to support an adjacent roadway by property owners, *25 the interpretation of the City Charter advanced by the respondent and adopted by the majority finds no support as part of the "existing rules or understandings” of property law before this litigation.
While the majority characterizes the arguments presented herein as a "narrow” reading of the law, the interpretation is consistent with the authorities and evidence submitted by the respondent. It is the majority that expands the existing obligations under State property law beyond the limits that such law has heretofore been interpreted. The fact that the respondent has the burden to prove the result reached by the majority is especially troubling when one considers the substantial difference between the preservation of existing support and the obligation to create the level of additional support necessary under the circumstances. Indeed, under the subject City Charter provision, plaintiffs are required to suffer a permanent physical invasion of their property and pay for any direct property damage as well as the costs for respondent’s construction — construction that would, ordinarily, constitute a compensable taking.
Allowing the City to justify the permanent physical occupation of part of plaintiffs’ property on the basis of a spontaneous construction of the common law and a City Charter provision would be allowing the City, " 'by ipse dixit, [to] transform private property into public property without compensation’ ” (Lucas v South Carolina Coastal Council, supra, 505 US, at 1031, quoting Webb’s Fabulous Pharmacies v Beckwith, 449 US 155, 164). The result reached by the majority is precisely the situation the Supreme Court refused to sanction in Lucas.
Finally, an easement on plaintiffs’ property was not created when the City filed the map raising the legal grade of the street (see, Nollan v California Coastal Commn., 483 US 825, 833, n 2). However, that filing may have thereafter limited the ability of plaintiffs to construct improvements on their property at any grade other than the legal grade (see, People ex rel. Architects’ Offs. v Ormond, 201 App Div 787, 792, affd 234 NY 549; Matter of Mellilo v Kracke, 261 App Div 631, 634). Until the City actually raised the grade of the street, however, it would have been impossible to determine the extent of any necessary taking of the property of plaintiffs or any other adjoining landowners.
In sum, plaintiffs have suffered a permanent physical occupation which constitutes a taking. The judgment appealed *26 from and the order of the Appellate Division brought up for review should be reversed and the case remanded for a determination of just compensation.[8]
Chief Judge Kaye and Judges Bellacosa and Levine concur with Judge Ciparick; Judge Smith dissents and votes to reverse in a separate opinion in which Judge Wesley concurs; Judge Titone taking no part.
Judgment appealed from and order of the Appellate Division brought up for review affirmed, with costs.

. Specifically, the notice read as follows:
"This Department intends to improve to its legal grade the street abutting your property. This will result in the raising of the street elevation approximately 5.0 feet, subject to modification. To protect the street against the resulting lower grade of your property and to maintain the street at legal grade requires that side fill be placed on your property.
"Your consent to permit the placing and sloping of such side fill by the Department of Highways or its agents is requested. Please sign and send one copy of the accompanying 'CONSENT’ form to this office in the enclosed stamped self-addressed envelope within ten (10) days from the date stamped on the return receipt. Retain the second copy for your records.
"There will be no charge to you for the placing and sloping of side fill on your property if the return of the signed form is timely. You, however, will be responsible for the removal and relocation of landscaping, fences, walks, stairs and other structures, whether or not they are attached to a building, which may be disturbed due to fill operations. The within consent in no way constitutes a waiver of or release from your obligation to construct and/or *16 maintain the sidewalk abutting your property pursuant to Section 2903 & 2904 of the New York City Charter.
“In the event we do not receive the consent within the said ten (10) days, you may be required to fill your lot abutting the street to legal grade at your own cost. Upon your failure to do so, this Department may fill your lot to legal grade, the cost of which shall be due and payable and shall constitute a lien against your property.”

. Moreover, the flexibility envisioned by the "different question” is not available to the plaintiffs here since dirt filling 2,400 square feet of a delineated area offers little room for plaintiffs’ input or modifications. Although the plaintiffs may use the dirt deposited on their property, they are necessarily denied dominion over their property beneath the side fill. That area is occupied, and permanently so. Furthermore, a permanent physical taking may occur regardless of the size of the area occupied or the de minimis impact the taking has on the owner’s use of the rest of his land (Loretto v Teleprompter Manhattan CATV Corp., supra, at 430).

. Section 2904 was amended in 1992 to add a reference to section 19-152 of the Administrative Code which provides that an order to "fill any sunken lot” following an inspection of the real property by a "departmental inspector” must be based on "risk or hazard assessment criteria” (see, L 1992, ch 813, §§ 2-3). The impact of this amendment, which did not take effect until after the occurrence of the events giving rise to this action, is not before us.

. Although not dispositive, it should be noted that only the obligation to repair sidewalks under section 2904 is referred to in the notice sent to plaintiffs in March 1990 by the DOT. The DOT notice contains no cited authority, statutory or otherwise, for which plaintiffs would have an obligation to raise their property to the level of the roadway.

. While the majority refers to the reference to "raised lot[s]” within section 2904 as somehow indicative of the proper meaning of "sunken,” it should be noted that the reference to "raised lot[s]” was not added to the provision until 1977 (Local Laws, 1977, No. 27 of City of New York). Oversight of "sunken lots” has been included in the New York City Charter for decades (see, 1901 Greater NY Charter § 388; NY City Charter former § 230 [added by L 1962, ch 998, § 25]; People ex rel. Collins v Ahearn, 193 NY 441, 444). Of course, "raised lot[s]” could also refer to the elevation of the lot itself rather than the lowering of the surrounding property.

. Neither may the majority’s conclusion be supported by Laba v Carey (29 NY2d 302). In that case, this Court noted that the City Charter places the responsibility for the maintenance and repair of sidewalks on the individual owner, thereby ensuring that sidewalks are at the legal grade which is "nothing more than a normal incident to the ownership of real property within the City of New York” (29 NY2d, at 312). The holding of that case is wholly dissimilar to the circumstances here. The issue in Laba was whether the legal grade applicable to the sidewalks would inhere in title when a variance had previously been granted by the City. Similar to zoning ordinances and variances thereto, the Court simply ruled that the legal grade and variance were properly considered limitations within title (see also, Matter of Gazza v New York State Dept. of Envtl. Conservation, supra). Here, there is no "legal” grade of plaintiffs’ property. Moreover, the oft-cited duty to maintain and repair defective sidewalks is clearly dissimilar from the heretofore unknown obligation to add side fill over 2,400 square feet of one’s property to protect a new, adjacent roadway construction.

. There is no evidence that the purchase price paid by plaintiffs was based upon an awareness of the obligations and rights announced by the majority. Indeed, plaintiffs sued the sellers for fraud because they allegedly were unaware of such duties.

. The issue of just compensation cannot be resolved on. the current record. However, it should be noted that plaintiffs have the burden to demonstrate the value lost due to the taking and a conclusory assertion that the property is "worthless to them” is clearly insufficient.